87 N.J. Super. 391 (1965)
209 A.2d 640
ISIDORE FELDMAN, PLAINTIFF AND THIRD-PARTY PLAINTIFF,
v.
URBAN COMMERCIAL, INC., ET AL., DEFENDANTS.
ISIDORE FELDMAN, THIRD-PARTY PLAINTIFF-APPELLANT,
v.
THE TITLE GUARANTEE COMPANY, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1964.
Decided April 29, 1965.
*394 Before Judges GOLDMANN, SULLIVAN and LABRECQUE.
Mr. Henry F. Wolff, Jr. argued the cause for third-party plaintiff-appellant (Messrs. Brogan & Wolff, attorneys).
Mr. Elmer J. Bennett argued the cause for third-party defendant-respondent The Title Guarantee Company (Messrs. Carpenter, Bennett & Morrissey, attorneys; Mr. John C. Heavey, Jr., on the brief).
The opinion of the court was delivered by LABRECQUE, J.A.D.
This is an appeal from a judgment of the Chancery Division (78 N.J. Super. 520) dismissing plaintiff's third-party complaint in which he sought recovery against the third-party defendant under a mortgage title policy.
The land covered by the mortgage was part of the St. John's Project Area, an assemblage acquired by the Jersey City Redevelopment Agency (Agency) under various statutory urban renewal authorizations. Under the urban redevelopment plan (plan) adopted on March 3, 1955 by the municipal governing body, the area was divided into two sections, a business area and a residential area. Pursuant to the plan, Agency entered into a redevelopment contract (contract), dated October 25, 1955, with Urban Developers, Inc. (Developers), involving both sections. The contract contained the following pertinent conditions and covenants: (1) Agency was to convey both sections to Developers; (2) Developers was prohibited from selling, transferring or conveying any part of the project area or making any profit from a conveyance in the area until all construction was completed (the anti-speculation clause); (3) it could, however, with the written consent of Agency, sell, lease, transfer or convey any portion of the project area, prior to completion of construction, *395 subject to the anti-speculation provision above, to any entity consisting of stockholders of Developers; (4) it was to start work within two months and to complete all construction within 30 months thereafter; (5) if it failed to carry out its obligations it was, upon written notice by Agency to it and to the holders of record of all building loan agreements and/or first mortgages in replacement thereof, required to reconvey the area to Agency. However, before this forced reconveyance was to take place, the holders of building and loan agreements and/or first mortgages in replacement thereof, had the option of completing any construction or correcting any defaults on the part of Developers. The deed to Developers (deed) obligated them to the redevelopment plan and contained the anti-speculation clause set forth in the contract.
The date of the closing between Agency and Developers was June 11, 1956. On that day Agency also permitted Developers to convey the portion of the area assigned to business, to Urban Commercial, Inc. (Commercial). Commercial, whose stockholders were identical with those of Developers, had previously informed Agency that it was aware of the terms of the redevelopment contract and that it would assume all of Developers' obligations therein. The money for the purchase of both areas was furnished by plaintiff. He received from Commercial a promissory note for $450,000 "or so much thereof as may be advanced," secured by a purchase money mortgage on the business section only, payable in two years. However, plaintiff actually advanced only $250,000, of which $148,254.59 was paid over to Agency as consideration for the conveyance of the business section and $101,807.66 to Agency for conveyance of the residential section to Developers. Later, during the year 1956, plaintiff advanced another $100,000 to Developers, making his total outlay $350,000.
On April 2, 1958, the mortgage became overdue and plaintiff and Commercial entered into an agreement increasing the amount due plaintiff by $42,000, and extending the due date to January 11, 1959.
*396 The construction called for in the contract was not completed within the 32 months provided for therein  it was not even started. On March 23, 1959 Agency notified Commercial of the default, but no notice was given plaintiff prior to August 27, 1959. On the latter date Agency gave plaintiff's attorneys notice of default. At a sheriff's execution sale held July 22, 1959 Agency had purchased all of Developers' interest in the area.
Plaintiff thereupon instituted an action to foreclose his mortgage for default in payment of the alleged balance of $392,000. Among the defendants was Agency. The latter counterclaimed to have the mortgage declared null and void for the reason, inter alia, that it violated the prohibition of conveyances without the consent of Agency, contained in both the contract and deed. Plaintiff thereupon filed a third-party complaint against The Title Guarantee Company (Title Company) which had issued a policy of insurance covering the mortgage in question. The foreclosure and third-party complaint were then severed, the former being accorded precedence. During the course of the foreclosure proceedings, a motion for partial summary judgment was made for the purpose of resolving two questions: (1) whether the mortgage between Commercial and plaintiff was an unauthorized conveyance, i.e., violative of the requirement that it have the consent of Agency, and (2) whether the alleged failure of Commercial and Developers to complete the project within the time allotted entitled Agency to a reconveyance of the premises unencumbered by the lien of plaintiff's mortgage. Other issues between the parties were reserved for a subsequent hearing.
Judge Kilkenny, then sitting in the Chancery Division, ruled that the existence of the mortgage did not violate the prohibition against transfer or conveyance without the consent of Agency, but that if plaintiff proceeded to foreclose his mortgage and then took title at sheriff's sale, there would be an effective transfer or conveyance which would violate the agreement. He further held that Agency was entitled to a *397 reconveyance for failure to carry out the terms of the contract, and that such reconveyance would not be subject to plaintiff's mortgage because it was not a valid first mortgage in replacement of an existing building loan agreement. However, he determined that plaintiff was entitled to an equitable lien against the business area for $148,254.59, the part of the $250,000 which had actually been advanced for the purchase of that tract. Feldman v. Urban Commercial, Inc., 64 N.J. Super. 364 (Ch. Div. 1960). There was no appeal from this determination.
When the foreclosure action came on for trial, plaintiff contended that Agency was estopped from attacking the validity of his mortgage and his right to foreclose by reason of Agency's knowledge of the making thereof and its acquiesence therein. He also set up, as additional separate claims, laches and waiver of Agency's purported right to require its consent to the making of the mortgage.
The trial resulted in a judgment in favor of Agency. Feldman v. Urban Commercial, Inc., 70 N.J. Super. 463 (Ch. Div. 1963). In effect, the court, Collester, J.S.C., held that the defect in the mortgage was of plaintiff's own doing, in the face of his knowledge of the provisions of the deed and contract; and that he came into court with unclean hands, and had failed to establish his affirmative claims of waiver and estoppel. In reaching its conclusion the court found:
"Feldman was a stockholder and director of both corporations, Developers and Commercial. His brother and business partner, Jerome Farmer  his alter ego , also was a stockholder and director of both corporations in addition to being treasurer of both. Feldman's accounting firm kept the books of both corporations and audited the same.
It is clear that Feldman knew if he placed a mortgage lien on the residential area, no F.H.A. construction mortgages could be obtained thereon unless his mortgage was subordinated. The mortgage transaction thus created was designed to keep the residential area `free and clear.'
Feldman also knew that only $148,254.59 of the original $250,000 advanced under the mortgage loan went into the purchase of the business area, and that the remainder of the $250,000 was to pay for the *398 residential area. He also knew that subsequent advancements made by him totaling $100,000 during the six-month period following the execution of the $450,000 mortgage, were expended to develop the residential tract. No improvements were ever made on the business area.
Feldman knew that on June 11, 1956, when title was acquired to said property, his mortgagor, Urban Commercial, was only a corporate shell, without any assets, income, or any hope of income to pay interest or principal payments on his mortgage or to pay municipal taxes assessed or to be assessed against the property. In addition, he knew on said date that Developers had exhausted all of its $100,000 capital except $5,000.
Plaintiff's admitted objective was `maximum security' for his investment. In his multiple capacity as stockholder and director of both corporations and as mortgagee he exercised firm control over all phases of the operation as the `money man.' His plan was to insure against any loss on the mortgage loan by subjecting the business area to the full brunt of his investment in the entire redevelopment project. Thus, if the redevelopment contract was breached by Developers, Agency was in fact to insure him against loss by his lien on the business area. If Agency required reconveyance as a result of Developer's breach of contract, Feldman planned to place Agency on the horns of a dilemma  either take back the business area subject to the lien of all money the plaintiff, as mortgagee, had invested in the development project, or, if Agency determined not to insist upon reconveyance, Feldman would acquire title to the business area upon the foreclosure of his mortgage, thereby rendering the redevelopment plan abortive and giving to Feldman the power to sell or develop the business area unfettered by Agency's plan. Thus, without Agency's knowledge or approval he was insuring his gamble.
The underlying concept of plaintiff's plan is unconscionable. The scheme was designed to have Feldman protected for his lost gamble at the expense of Agency. His idea was that in the event of a debacle, such as in fact did occur, he would be able to take over the business area in fee, free and clear of everybody, including Agency or require Agency, in order to save its redevelopment plan to pay over to plaintiff $392,000, his gamble, to clear a piece of property which had been sold for only $148,254.59." (at pp. 479-481)
and further:
"In my opinion, to permit the plaintiff to succeed in his plan to insure his gamble at the expense of Agency, where Agency had no knowledge of the placing of the mortgage, the subsequent advancements thereon plus the added principal of $42,000 caused by plaintiff's granting an extension of his mortgage to Commercial, would be unconscionable. In my opinion plaintiff does not come into this court with clean hands." (at pp. 481-482)
*399 Plaintiff, however, was permitted to recover the amount of the equitable lien referred to in the prior partial summary judgment, and thereafter proceeded to do so, thereby reducing, pro tanto, his claim against third-party defendant, Title Company. There was no appeal.
Plaintiff then proceeded with his third-party complaint against Title Company, based upon its policy insuring his mortgage. From the testimony, it developed that, prior to the contract between Agency and Developer, Title Company had agreed to examine the title, presumably for Agency, although the contract required Developers to bear the expense of title insurance. About one month prior to the date fixed for closing, it received an application from a firm of New York attorneys for a $250,000 fee (title) policy for a portion of the St. John Project Area, without disclosure of the identity of the proposed insured. It prepared a certificate and report of title for the attorneys who had made the application, certifying that Agency had good and marketable title and agreeing to issue a policy insuring Agency's title. There was as yet no application by plaintiff for a mortgage title policy, and no consideration was given to its issuance until the day of closing.
At the June 11, 1956 closing a Mr. Macknet was assigned by his superior to represent Title Company. He had not prepared the certificate of title and had no prior knowledge of Feldman's plan to obtain mortgage insurance. Deeds from Agency to Developers and from Developers to Commercial, as well as a mortgage from Commercial to plaintiff, were executed and then delivered to him for recording. During the course of the closing, application was made to him for the issuance of a policy insuring the mortgage. Since Macknet had already been authorized to issue a policy guaranteeing Agency's title to the land, it would ordinarily have been routine to issue a policy on the purchase money mortgage. Macknet was not alerted to the very serious legal question which existed as to whether a valid enforceable mortgage could be placed on the land in view of the fact that it was being used for redevelopment purposes. However, it was this very thing *400 that plaintiff was seeking to insure himself against. Not having been alerted to the danger, Macknet agreed to issue the policy although he advised plaintiff's attorney, and noted on his report of title, that the title was subject to restrictions in the deeds. Title Company later issued two fee policies and the mortgage title policy here in question. The latter contained a provision that it was subject to "restrictions as in deeds to Urban Developers, Inc."
At this point it should be noted that Judge Collester had previously found that plaintiff, an accountant with a law degree, was a principal in both Developers and Commercial, and his firm kept the books for Commercial. Title Company's title officer testified, however, that the policy would have been issued even if Title Company knew, which it did not, that these were the facts and that Feldman, the mortgagee, owned a percentage of the stock in the mortgagor corporation.
The trial judge, in denying recovery under the policy, first held that the failure to complete construction within the 32-month period as required by the contract between Agency and Developer was not a violation of a "restriction" which would bar recovery. He next disallowed Title Company's contention that Commercial had made an untrue statement as to a material fact on the basis that Title Company, through Macknet, had constructive notice of the vital provision of the redevelopment contract since it had recorded the deed which referred to the contract and contained substantially the same provision. He then found that any language in the certificate and report of title, which might possibly bar plaintiff's recovery because it was broader than that in the policy, did not benefit Title Company because the certificate became null and void once the policy itself was issued. Finally, however, he found that plaintiff by his affirmative acts had created or suffered the defect in the mortgage, contrary to the provisions of paragraph 8 (hereinafter quoted) of the policy.
The trial judge further held that the prior reported decisions of Judges Kilkenny and Collester were the law of the case, and that there was a sufficient nexus between the finding *401 by Judge Collester that the plaintiff had been guilty of unclean hands and had perpetrated an unconscionable scheme in order better to secure his investment, and the issues here involved, to estop plaintiff from recovering on the policy insuring his mortgage.
The policy in question insured the plaintiff:
"* * * against loss or damage not exceeding * * * Dollars which the Insured shall sustain by reason of any defect in the execution of said mortgage * * *, but only insofar as such defect affects the lien or charge of such mortgage * * * upon said land, or by reason of the invalidity of the lien thereof upon said land, or by reason of title to said land being vested at the date hereof otherwise than as herein stated, or by reason of unmarketability of the title of the mortgagor * * * or by reason of any defect in, or lien or encumbrance on said title at the date hereof, * * * other than defects, liens, encumbrances and other matters set forth in Schedule B, * * *."
Schedule B, which purported to list "defects, liens, encumbrances and other matters against which the company does not, by this Policy, insure," contained the paragraph 8 referred to in the opinion of the trial judge. That paragraph provided that:
"* * * The Company will not be liable for loss or damage by reason of defects, claims or encumbrances created subsequent to the date hereof (excepting any statutory lien for labor or material insured against by this Policy) or for defects, claims or encumbrances created or suffered by the Insured claiming such loss or damage, or existing at the date of this Policy and known to the Insured claiming such loss or damage at the date such insured claimant acquired an insurable interest but not known to the Company or disclosed to it in writing by the Insured. * * *"
The trial judge concluded that the latter clauses constituted two separable exclusions, the second clause having reference to defects, claims or encumbrances created or suffered by the insured claiming the loss, and the third having to do with defects, claims or encumbrances which, while not created or suffered by him, were known to him on the date of the mortgage but not known to the company or disclosed to it in writing by him. He found that plaintiff's recovery was barred *402 because his loss was "based on a defect `created or suffered' by him" within the meaning of the second clause of the paragraph and, thus, it was immaterial that, as a factor it was bound to evaluate relative to the risk it was undertaking, Title Company had constructive knowledge of the deal. (78 N.J. Super., at p. 531)
Plaintiff argues that the defect in the mortgage lien was not created or suffered by him but arose solely by reason of the provisions of the redevelopment plan, the underlying contract and the deed to the mortgagor. He alleges that the mortgage was unenforceable from the moment of its execution, not because of anything done by him, by way of unclean hands or otherwise, but because the covenants and conditions referred to, which prohibited resale of the mortgaged property without the prior written consent of Agency, would have been violated by a sheriff's deed following a foreclosure sale. Thus, he asserts, regardless of anything he might have done, the mortgage lien was defective, citing First Nat. Bank & Trust Co. of Port Chester, N.Y. v. New York Title Ins. Co., 171 Misc. 854, 12 N.Y.S.2d 703 (Sup. Ct. 1939). See also Hansen v. Western Title Ins. Co., 220 Cal App.2d 531, Cal. Rep. 668, 98 A.L.R.2d 520 (D. Ct. App. 1963).
A title insurance policy is subject to the same rules of construction as are other insurance policies. Sandler v. Realty Title Ins. Co., 36 N.J. 471, 479 (1962). Thus, we are required to determine the intention of the parties from the language of the policy, giving effect to all parts thereof so as to accord a reasonable meaning to its terms. Caruso v. John Hancock &c., Insurance Co., 136 N.J.L. 597, 598 (E. & A. 1948); Heake v. Atlantic Casualty Ins. Co., 29 N.J. Super. 242, 262 (App. Div. 1954), affirmed 15 N.J. 475 (1954). Since, normally, the insurer is responsible for the wording of the provisions of the policy and selects the terminology thereof, words of doubtful meaning are to be strictly construed against the insurer and liberally construed to uphold coverage. Sandler, supra, 36 N.J., at p. 479; Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488 (1960). An insured *403 is not to be denied recovery because of "technical encumbrances" or "hidden pitfalls." Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482 (1961); Sandler, supra, at p. 479. However, we may interpret the contract to afford coverage only "to the full extent that any fair interpretation will allow." Kievit, supra, at p. 482.
The trial judge held, and we agree, that the exceptions contained in the certificate and report of title dated June 11, 1956 would not preclude a recovery. One such exception covered:
"Defects * * * objections, liens or encumbrances created, suffered, assumed or agreed to by or with the privity of the insured."
A reading of the certificate in question leaves no doubt that it was intended to be a preliminary document, to be superseded by the title policy here sued upon. It contained a provision that:
"This certificate shall be null and void * * * (3) upon the delivery of the policy. Any claim arising by reason of the issuance of this certificate shall be restricted to the terms and conditions of the standard policy of insurance."
Accordingly, the certificate was superseded by the policy itself and, since reformation is not here sought, the parties are bound by the terms thereof.
A fair reading of paragraph 8 leads to the conclusion that the use of the word "or" between the second and third quoted clauses was a disjunctive one, tending to separate the two clauses and describe two separate situations in which coverage was not afforded. Black's Law Dictionary (4th ed. 1951), p. 1246. Our initial inquiry, therefore, is whether the defect here involved was created or suffered by plaintiff.
We note a dearth of cases dealing with the exclusion in question. In First Nat. Bank & Trust Co. of Port Chester, N.Y. v. New York Title Ins. Co., supra, cited by plaintiff, the mortgage title policy contained a provision excluding coverage for "defects and encumbrances * * * created, suffered, *404 assumed or agreed to by the insured, * * *." The court there construed the term "created" to mean some "affirmative act" on the part of the insured which brought the defect to fruition. It construed "suffered" to mean:
"* * * to allow, to let, to permit. * * * In one sense, `suffer' is synonymous with `permit.' * * * `Permit,' in one sense, connotes something less than consent, but in another sense it may mean an authorization by the party in question. * * * And to permit or suffer an act usually implies the power to prohibit, prevent or hinder it. * * * In another sense, the word `permit' means `consent.' * * * It may mean to grant, to give leave. * * * It has been said that every definition of `suffer' and `permit' includes knowledge of what is to be done under the sufferance and permission, and intention that what is done is to be done. * * *" (12 N.Y.S.2d, at p. 709; emphasis added)
We hold that the word "create" connotes the idea of knowledge, the performance of some affirmative act by the insured, a conscious and deliberate causation. The term "suffer" implies the power to prevent or hinder, and includes knowledge of what is to be done under the sufferance and permission, and the intention that what is done is to be done.
The defect here involved was the inability of the mortgagee to enforce his mortgage lien by foreclosure and sale by the sheriff. As held by Judge Kilkenny, such a sale would have constituted a conveyance which would have required the written consent of Agency. A conveyance without such consent would have been a violation of the contract which could have entitled Agency to a reconveyance without consideration. Thus, as of the time of the placing of the mortgage, Agency's consent was a sine qua non to its validity. Feldman affirmatively determined to accept the mortgage without such consent and did so. As noted, Feldman, in addition to being the mortgagee, was a stockholder and director of both Developers and Commercial and, as the "money man," exercised full control over all phases of the operation. That he was aware of the necessity for the written consent of Agency to a conveyance of the lands in question is evidenced by the fact that such written consent was sought and obtained for the *405 transfer from Developers to Commercial. Without passing upon the question of his motive, of which more, infra, it is clear, and we hold, that the execution and delivery of the mortgage, and its acceptance by him, without obtaining the consent of Agency, constituted affirmative acts which gave life to the unenforceable mortgage which forms the basis for the obligation plaintiff presently seeks to impose upon Title Company.
Referring, further, to cases involving the application of clauses similar to the one in question, we find that in Brick Realty Corp. v. Title Guarantee and Trust Co., 161 Misc. 296, 291 N.Y.S. 637 (N.Y. City Ct. 1936), defendant had issued a policy of title insurance which excluded defects and encumbrances created, suffered, assumed or agreed to by the insured. In a subsequent suit involving the title, the ex-wife of the mortgagor had brought suit, claiming that the purchase of the mortgaged property at foreclosure sale by the plaintiff corporation was part of a fraudulent scheme to destroy her dower right. The title company had declined to defend the action but plaintiff was ultimately successful in doing so. In holding that there was no obligation on the part of the insurance company to defend the action the court said:
"This defendant did not insure plaintiff against the consequence of his own acts, was not liable for any loss occasioned thereby, was not obligated to defend any suit attacking plaintiff's title, even though entirely unfounded, if based upon acts claimed to have been committed by plaintiff."
Brick Realty Corp. cited Taussig v. Chicago Title and Trust Co., 171 F.2d 553 (7 Cir. 1949), with approval. In that case the policy had contained an exception covering "defects, liens or encumbrances created, suffered or assumed" by the insured, and the court denied recovery in view of the bad faith of plaintiff, an attorney, who:
"* * * by a complex series of transactions we need not detail here, became the owner of the property here involved without the expenditure of any funds of his own, and that the trust estates of which he *406 was trustee were divested of the ownership which they formerly held, all of which was done without notice to the beneficiaries of the trusts; that in these dealings with the trust estates Taussig did not act in good faith, and in fact acted in positive bad faith as indicated by the facts of his knowledge of the law, his concealment of facts known to him, his use of a nominee and of the secret trust, and his failure to give notice to his beneficiaries." (at p. 554)
In Taussig, in passing upon the admissibility of a memorandum tending to indicate some prior knowledge on the part of the title company, the court held:
"So it may be, although we are not here called upon to determine, that the memoranda relied upon by appellants to show waiver of objections based on this potential defect of the title involved would have been effective for that purpose if no more were shown that what we might call `technical' violation of the breach of fiduciary duty showing no bad faith. However, the decree of the court was based on findings, amply supported by the evidence, of positive derelictions in his fiduciary duty, not mere technical violations."
In Rosenblatt v. Louisville Title Company, 218 Ky. 714, 715, 292 S.W. 333 (Ct. App. 1927), the title policy excepted from coverage defects "created by the act or with the privity of the insured." The insurer defended on the ground that the deed, which was the subject of the policy, had been procured by fraud on the part of the insured. The court held:
"The defect in title then must be ascribed to act of the [insured] for she is the one whom the lower court found to be guilty of the fraud in procuring the deed, and this injected the defect into the chain of title. She was not insured by the appellee insurance company against loss on account of defects, objections and encumbrances created by the act or with the privity of the insured." (at p. 334)
The trial judge found that there was a sufficient nexus between the parties litigant to preclude a recovery by plaintiff. We agree. From the facts before us the conclusion is inescapable that the defect here involved arose by reason of conduct which was part and parcel of plaintiff's inequitable dealings with Agency, as set forth in the opinion of Judge Collester, supra, 70 N.J. Super. at pp. 479-482, and fully *407 supports the trial court's denial of liability. As part of the unconscionable scheme which he had devised, he sought to guarantee against failure of his plan to saddle the business section with the cost of acquisition of both the business and residential sections of the project area.
Ordinarily, the consent of Agency would have been the normal means of guaranteeing the total enforceability of the mortgage which he was about to place. In the absence of such consent, a mortgagee was relegated to waiting until performance of the contract was completed, although he could, in the meantime and under certain conditions, preserve his lien by curing such defaults in performance as might arise. Here, however, there were obstacles to such a course. By the anti-speculation clause of the plan and contract, not only were conveyances without the consent of Agency forbidden, but Developers and its grantees were prohibited from making any profit from the conveyance of any of the property involved until completion of construction which the contract called for. In the event of a conveyance with the consent of Agency, the consideration therefor was not to exceed "an amount representing the actual cost to the party of the second part [Developers] of the project area, and the project or the remainder thereof, as the case may be, including the cost of any improvements made thereon, and carrying charges." Thus, even if plaintiff had sought the written authorization of Agency to the making of the mortgage, Agency would have been without authority to consent to the making of a mortgage in excess of $148,254.59, the cost of acquisition. Since his plan called for a $450,000 mortgage, he determined to insure its validity through a mortgage title policy.
Plaintiff's failure to apply for the mortgage policy until the closing was actually in progress confirms the connection between its issuance and his over-all plan. Further, by so doing, he had, partially at least, eliminated the possibility that Title Company would be alerted to the vital defect inherent in the mortgage. Macknet, likewise, was not alerted to the fact that issuance of the policy amounted to much more *408 than a routine matter or the "normal affair" that he assumed it was.
Plaintiff was required to act in the utmost good faith in dealing with third-party defendant. Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 122 (1962); Atlantic Cas. Ins. Co. v. Interstate Ins. Co., 28 N.J. Super. 81, 85 (App. Div. 1953); cf. Gallagher v. New England Mutual Life Ins. Co. of Boston, 19 N.J. 14, 20 (1955). He failed to do so with the intent, we are satisfied, that it would be lulled into a sense of security and issue the policy without consideration of the vital point involved. Such conduct bears all of the earmarks of fraud from which equity will relieve. Cf. Gierth v. Fidelity Trust Co., 93 N.J. Eq. 163, 166 (E. & A. 1921); Nicholson v. Janeway, et al., 16 N.J. Eq. 285, 287 (Ch. 1863); St. John The Baptist, &c., Church v. Gengor, 118 N.J. Eq. 467, 497 (Ch. 1935); Jaeggi v. Andrews, 124 N.J. Eq. 155, 162 (Ch. 1938).
Aside from this, by the terms of the policy Title Company was not liable for defects in the mortgage created or suffered by plaintiff. The mortgage defect in question, i.e., its lack of enforceability, came into being by reason of plaintiff's deliberate, affirmative action, in pursuance of his unconscionable scheme, as detailed in the opinion of Judge Collester (70 N.J. Super., at pp. 479-482), to reap undeserved and illegal financial profits from the project in question. In consequence, he was properly denied a recovery. Brick Realty Corp. v. Title Guarantee and Trust Co.; Taussig v. Chicago Title and Trust Co., and Rosenblatt v. Louisville Title Company, supra. See also Annotation, "Title Insurance: exclusion of liability for defects, liens or encumbrances created, suffered, assumed, or agreed to by the insured," 98 A.L.R.2d, at p. 527.
The cases to the contrary relied upon by plaintiff are clearly distinguishable. In First National Bank & Trust Co. of Port Chester, N.Y. v. New York Title Insurance Co., the defect was held not to have been created or suffered by the insured because it had no actual intent to obtain the preference which resulted. Likewise, in Hansen v. Western Title Insurance Co. *409 the defect was the result of inadvertence, rather than conscious causation on the part of the insured.
We perceive no merit to the remaining points urged, especially plaintiff's argument that the exclusionary clause covering defects created or suffered by the insured should not be held applicable in view of the fact that the policy was obtained for the very purpose of assuring the enforceability of the mortgage in question. Plaintiff cannot thus be permitted to profit from his own wrong. Here the defect was not brought about by some accidental or innocent conduct on the part of plaintiff, Annotation, 98 A.L.R.2d, at p. 528, but resulted from his own inequitable dealings. Thus the situation in which he now finds himself is of his own deliberate doing.
The result thus reached renders unnecessary consideration of the remaining points raised by respondent.
The judgment of the Chancery Division is affirmed.