155 N.J. Super. 332 (1978)
382 A.2d 933
PIONEER NATIONAL TITLE INSURANCE COMPANY, PLAINTIFF-APPELLANT,
v.
PHYLLIS LUCAS AND LAWRENCE E. GOLDSCHMIDT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 1977.
Decided January 12, 1978.
*334 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Richard E. Brennan argued the cause for appellant (Messrs. Shanley & Fisher, attorneys).
Mr. James J. Higgins argued the cause for respondent Phyllis Lucas (Messrs. Porzio & Bromberg, attorneys).
Mr. Charles W. Hutchinson argued the cause for respondent Lawrence E. Goldschmidt (Messrs. Lamb, Hutchinson, Chappell, Ryan & Hartung, attorneys).
The opinion of the court was delivered by KOLE, J.A.D.
Plaintiff (Pioneer) brought this action to rescind a policy of title insurance issued to defendant Lucas on the ground that the policy had been procured by fraud. Goldschmidt, Lucas' attorney, was joined as an "interested party." The trial judge, sitting without a jury, entered judgment in favor of defendants. He denied rescission and *335 directed Pioneer to defend the quiet title action instituted by one Baker, an adjoining landowner. Baker claimed title to land covered by the policy. Pioneer appeals. We reverse.
Lucas learned by two letters from her Morris County attorney (not Goldschmidt) of the existence of an adverse claim against a portion of her property located in Denville Township. The township's tax map showed that Lucas owned the property, and she had been paying taxes on it for many years. However, an exhaustive title search performed for the adjoining landowner, Baker revealed that approximately 13 acres of the property, described in the tax map as belonging to Lucas, actually belonged to Baker. The problem, as Lucas' Morris County attorney described it to her in the letters, stemmed from the fact that some time in the 19th Century Lucas' predecessors in title twice conveyed the subject property. In the second conveyance (to Lucas' predecessor) they were attempting to pass title to land they did not own.
In the letters the Morris County attorney also informed Lucas that the search which revealed the defect was comprehensive and appeared to be accurate; that it was "unbelievably voluminous" and required "sophisticated analysis," and that the title searcher "was so confident of [his search] that he would be prepared to testify as to its accuracy in court." He added that the only way to check its accuracy would be to have another search performed, which would be quite expensive, costing $1,200 to $1,500 or more. He stated further that if Lucas wanted a third person to examine the matter, it should be done "by an experienced real estate attorney [or] it might be well to have it done through a New Jersey title company. * * * It appears that a search was never obtained when the property was bought, and this may be the basis of the whole problem."
Armed with this knowledge, instead of consulting with her Morris County attorney or other New Jersey counsel, Lucas retained Goldschmidt, a New York attorney with considerable experience in real estate matters. Having been *336 apprised of the nature of the problem by the letters, Goldschmidt requested Pioneer to perform a title search. He telephoned John Kitchen, manager of Pioneer's branch office in Morristown, and that same day Goldschmidt wrote a letter confirming the substance of the telephone call. The letter advised Pioneer that the most recent deed (a copy of which was enclosed) did not conform to the description in the tax map, and that Goldschmidt wanted to know if Lucas had marketable title to the property described in the deed, whether the property in the deed was that described in the tax map, and if it was not, the manner in which the deed description varied from the tax map. The letter further indicated that Kitchen had advised him that the "fee for an examination of title including tracing the chain of title for 60 years and advising us of our options in the event that record title and/or tax title do not agree with the piece of property [described in the deed] which we [Lucas] believe we own, will not be in excess of $100.00."
It should be noted that the letter did not state that Goldschmidt was aware of the fact that a serious question existed as to Lucas' ownership of a portion of the property. Additionally, rather than ordering the exhaustive, expensive search of the type suggested by Lucas' New Jersey attorney as necessary to check the accuracy of the search made for Baker, in the letter Goldschmidt requested a 60-year search at a cost not in excess of $100.[1] Goldschmidt testified that in their conversation he told Kitchen that there was an adverse claim on the property stemming from the 19th Century, but that portion of the telephone conversation was not included in the letter because "the letter was a summary." *337 Goldschmidt admitted that he never told Kitchen specifically about the Baker claim or the nature, origin and extent thereof, because it had been his experience that "if a title company gets a whiff of gun powder it runs very scared."
Not surprisingly, the 60-year search performed by Pioneer did not uncover the defect in Lucas' title, which, as indicated, went back to the 19th Century. Upon Goldschmidt's advice, Lucas, through Goldschmidt, then secured a $550,000 title insurance policy from Pioneer insuring the subject property. The policy was issued on December 23, 1974. Thereafter, Baker, the adjoining landowner brought a quiet title action. Plaintiff tendered a return of the premium, which was refused. This action to rescind the policy followed.
The trial judge, although at one point noting that Goldschmidt's conduct, after learning the state of Lucas' title, "hinted at fraud," found no fraud and denied rescission. He viewed Goldschmidt's letter to Kitchen confirming their telephone conversation as the manner in which "the attorney saw fit to call to the attention of the title company the problem which he had in mind," and stated that the purpose of the requested title search was to find out what Lucas owned. He determined that Pioneer had not relied upon any representations or omissions by Goldschmidt in making its search and issuing the policy; rather, it had relied upon the report of its title examiner, particularly since after the policy had been ordered, it directed its examiner to "check back title of search * * * since this is such a big job." He found that Pioneer was negligent in limiting itself to a 60-year search and in its examiner's failure to plot out the deed description. Such plotting, he said, would have made the examiner aware of the problem here involved and indicated the need for a search beyond 60 years. He also found Pioneer negligent in not being alerted to the possibility of an adverse claim when Goldschmidt insisted on omitting from Lucas' affidavit of title the provision as to her lack of knowledge of adverse claims.
*338 The scope of our review in a nonjury case is set forth in State v. Johnson, 42 N.J. 146, 159-162 (1964). See also, Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974); State Farm Mut. Auto Ins. Co. v. Wall, 92 N.J. Super. 82, 98 (App. Div. 1966).
If we are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole, his determination should not be disturbed. However, if we are thoroughly satisfied that the findings and the ultimate conclusions are clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction, we should appraise the record as if we were deciding the matter at inception and make our own findings and conclusions. This feeling of "wrongness" arises where our review of the proofs leaves us with the definite conviction that the judge went so wide of the mark that a mistake must have been made. It can arise in many ways  from manifest lack of inherently credible evidence to support significant findings, obvious overlooking or underevaluation of crucial evidence, or a clearly unjust result.
Using the foregoing standard of review, we are convinced that the determination of the trial judge was so wide of the mark that a clear mistake was made and a plainly unjust result was reached.
An insurance contract, including one of title insurance, requires the highest degree of good faith and fair dealing between the parties. It requires the insured to advise the insurer of such matters that he knows might influence the insurer in entering into or declining the risk, at least where such facts are not of record and are not discoverable therefrom by the insurer. See Gallagher v. New England Mut. Life Ins. Co. of Boston, 19 N.J. 14 (1955); Weir v. City Title Ins. Co., 125 N.J. Super. 23 (App. Div. 1973). To avoid the policy the insurer may show a concealment constituting a designed and intentional withholding of a fact material to the risk, which the insured in honesty *339 and good faith should have communicated to the insurer. See Metropolitan Life Ins. Co. v. Lodzinski, 122 N.J. Eq. 404 (E. & A. 1937); Kozlowski v. Pavonia Fire Ins. Co., 116 N.J.L. 194, 196-198 (E. & A. 1936); cf. Johnson v. Metropolitan Life Ins. Co., 53 N.J. 423 (1969). See also Weintraub v. Krobatsch, 64 N.J. 445 (1974); Foont-Freedonfeld v. Electro-Protective, 126 N.J. Super. 254 (App. Div. 1973), aff'd 64 N.J. 197 (1974).
We have concluded that the judge did not properly evaluate significant evidence  that involving Goldschmidt's role in the transaction  and, as a consequence, made inferences as to reliance by Pioneer that are manifestly erroneous. The record establishes beyond question that this policy was procured by half-truths and concealment by Goldschmidt that justify its recission. The trial judge's findings that there was no intentional concealment of facts material to the risk or reliance thereon by Pioneer cannot be supported by the credible evidence.
The determination of Pioneer's right to rescind must be viewed against the background of what led to the issuance of this $550,000 title insurance policy. From our review of the evidence, we have no doubt that the significant factor here is the knowledge, acquired by Lucas primarily through Goldschmidt, of the possible defects in her title to the 13 acres. It is Goldschmidt's actions, as evidenced by the testimony and documentary proofs at trial, upon which, in our view, the result in this case hinges. Goldschmidt was Lucas' agent in this respect. Weir v. City Title Ins. Co., supra, 125 N.J. Super. at 31.
We find Goldschmidt's testimony in certain important respects to be inherently incredible. We also find that his conduct in obtaining the $550,000 policy is such as to lead to only one reasonable inference  namely, that he, as agent for Lucas, deliberately failed to disclose to Pioneer known matters relating to the title, material to the risk insured against, as part of a design to mislead it into issuing this substantial title policy. We are further convinced that such conduct by *340 Goldschmidt lulled Pioneer into a false sense of security in making and relying on the customary 60-year search and issuing the policy predicated thereon; and that but for such conduct, the policy based on that limited search would not have been issued. Thus, even if Pioneer could be said to have been negligent, that negligence was the result of such reliance on Goldschmidt. He took advantage of Pioneer's credulity by leading it to believe that the usual 60-year search would suffice, when he knew that an adverse claim was being made by reason of conveyances well beyond that period  in the 19th Century.
If Goldschmidt sought the title search from Pioneer in order to determine the accuracy of the title search prepared for the adjoining landowner, as Lucas' Morris County attorney suggested, then he would have told Kitchen specifically about the Baker claim and would not have acquiesced in a 60-year search. That discovery of the true state of Lucas' title was not Goldschmidt's purpose is conclusively demonstrated by (1) his testimony that he did not advise Kitchen of the Baker claim because Pioneer might get a "whiff of gun powder" and run "very scared," and (2) his acquiescence in a title search estimated to cost $100 at a time when he was advised that a search of the scope necessary to check the prior search would cost $1,200 to $1,500 or more. The only inference that reasonably may be drawn is that Goldschmidt's real purpose was to secure a favorable title search (a likely possibility since the standard 60-year search might not reveal the defect), in order to later secure title insurance from Pioneer before the adjoining landowner instituted a quiet title action.
We simply refuse to credit Goldschmidt's testimony that he informed Kitchen that there was an adverse claim involving a 19th century title defect during their initial telephone conversation, and that when he advised Kitchen that he was striking out the "no adverse claim" paragraph in Lucas' affidavit of title, he thus regarded Kitchen as being aware of that outstanding claim. His testimony that he had *341 orally informed Kitchen of the claim is in sharp contrast to his statement that he did not include this information in his confirming letter requesting the 60-year search because he was concerned about the title company's becoming "scared". It is most difficult to believe that this view of a title insurance company's timidity in issuing a policy when it knows of an outstanding claim did not also deter Goldschmidt from orally informing Kitchen of the claim.
Defendants argue that they were under no duty to disclose to Pioneer those defects which appear in the record. Their reliance on Research Loan and Investm. Corp. v. Lawyers Title Ins. Co., 225 F. Supp. 287 (W.D. Mo. 1964), rev'd on other grounds 361 F.2d 764 (8 Cir.1966), for that proposition is misplaced. Even if we were to assume that Research expresses the law of this State, the case is inapposite.
There, unlike here, the title company failed to prove that the insured had actual knowledge of all but one of the title defects in issue. In addition, the proofs there showed that the insured did reveal the known defect to the insurer's agent. 361 F.2d at 768.
Further, this is not merely a case where a layman or even an attorney is aware of a title defect and does not inform the title insurance company thereof. It may very well be  although we do not pass on that question  that in such a situation the company may still be liable, since it is in the business of searching and guaranteeing titles. See Caravan Products Co., Inc. v. Ritchie, 55 N.J. 71, 74 (1969). However, here more than awareness of a title defect is involved. The insured's attorney actually knew of an adverse claim discoverable only by a search beyond the usual 60 years; yet by deliberate silence, he induced the title company to rely on a 60 year search. Moreover, in the letter to Pioneer confirming the request for a title search, Goldschmidt stated that the problem he wanted examined consisted of a disparity between the description of the property in the deed and the tax map. This reflects an attempt to lull Pioneer into believing that the difficulty, *342 if any, was something quite different from the real problem.
Far more analogous than Research Loan and Investm. Corp. v. Lawyers Title Ins. Co., supra, is Parker v. Title and Trust Co., 233 F.2d 505 (9 Cir.1956), reh. den. 237 F.2d 423 (1956), where, under facts closely resembling those in the present case, the court rejected the argument that the insured had no duty to disclose defects known to it. As in Parker, here there was more than mere nondisclosure. Through deliberate concealment, accompanied by half-truths, defendants set a trap for Pioneer. Such conduct bears all the earmarks of the kind of acts from which a court of equity will relieve. Cf. Feldman v. Urban Commercial, Inc., 87 N.J. Super. 391, 408 (App. Div. 1965).
Defendants' contention that Pioneer did not rely on their concealment and half-truths is meritless. We are satisfied that the proofs established that Pioneer would not have issued the title policy had it known of the possible adverse claim involving Lucas' title. Thus, there was reliance. John Hancock, etc., Ins. Co. v. Cronin, 139 N.J. Eq. 392 (E. & A. 1947).
As indicated, the trial judge found that Pioneer was negligent in a number of respects, and that had it exercised due care, it would have uncovered the title defect. Assuming the validity of such findings, they do not change the result that we have reached. One who engages in the kind of conduct here involved may not urge that his victim should have been more circumspect or astute. See Judson v. Peoples Bank and Trust Co., 25 N.J. 17, 27 (1957); Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 483-484 (1954); Peter W. Kero, Inc. v. Terminal Constr. Corp., 6 N.J. 361, 369-370 (1951). Even if Pioneer negligently searched Lucas' title, it violated no duty toward defendants in the context of the facts disclosed by this record. As stated in Parker v. Title and Trust Co., supra, where allegations of negligence were also raised: "Surely a person thus led into *343 a trap owes no duty to the one who did the trapping." 233 F.2d at 510.
The judgment is reversed. Judgment will be entered in favor of Pioneer rescinding the title policy upon repayment of all premiums paid therefor.[2]
NOTES
[1] The unrefuted testimony at trial was that a 60-year search is standard in the title insurance industry. See N.J.S.A. 2A:14-30; Gordon v. Lumberville Delaware Bridge Co., 108 N.J.L. 261 (E. & A. 1932).

The letter stated that if the cost of the search exceeded $100, Pioneer should contact Goldschmidt before continuing.
[2] Conceivably there may still be title in Lucas to the 13 acres, predicated on adverse possession or otherwise. See n. 1, supra. But at trial Pioneer appears to have taken the position that Lucas does not have title; thus, there is a real question as to whether it could properly defend the Baker's quiet title action even if there were coverage. See Sussex Mut. Ins. Co. v. Hala Cleaners, Inc., 75 N.J. 117 (1977).