673 A.2d 810

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. $36,560.00 IN U.S. CURRENCY, DEFENDANT.

(BEVERLY BLIGHT AND KENNETH JONES,
INTERESTED PARTIES).

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BEVERLY
BLIGHT, DEFENDANT, AND KENNETH L. JONES,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted February 6, 1996—Decided April 1, 1996.

Before Judges MICHELS, BAIME and VILLANUEVA.

*Deborah T. Poritz,* Attorney General, attorney for appellant (Bennett A. Barlyn, Deputy Attorney General, of counsel and on the brief).

*Finnegan & Barth,* attorneys for respondent Kenneth Jones (*John J. Finnegan III,* of counsel and on the brief).

The opinion of the court was delivered by

VILLANUEVA, J.A.D.

The State appeals from an order denying its forfeiture claim for $36,000 in cash that was found in a strongbox underneath a one-pound bag of marijuana and $610 found in a purse discovered during a valid search. The State also appeals from a judgment acquitting Kenneth L. Jones (defendant) entered by the Law Division judge seventy-two days after the judge had originally found defendant guilty of possession of marijuana, in violation of *N.J.S.A.* 2C:35–10a(3).[1] We consolidated the two appeals.

During the execution of a search warrant on October 28, 1993, at the residence of Beverly Blight (Blight) at 318 Ash Road, Bass River Township, members of the Ocean County Narcotics Strike Force (Strike Force) found $36,560[2] in cash and more than one and one-half pounds of marijuana.

On January 13, 1994, the Ocean County Prosecutor's Office filed a verified complaint for forfeiture of the $36,560, alleging that it

---

[1] The only judgment of conviction/judgment of acquittal entered (which erroneously states that the adjudication was by jury trial) states:

> It is, therefore, on 12/22/94 ORDERED AND ADJUDGED that the defendant is acquitted of the charges contained in Counts One and Five of Indictment 94–5–00442.
>
> It is, therefore, on 03/03/95 ORDERED AND ADJUDGED that the defendant is acquitted of the charges contained in Count Four of Indictment 94–5–00442.

[2] The amount set forth in the forfeiture complaint is derived from the $36,000 found in a strongbox at 318 Ash Road and $610 recovered from Blight's purse, minus $50 used by investigators to conduct a controlled purchase of marijuana from Blight prior to the execution of the search warrant.

constituted proceeds of illegal drug activity or, alternatively, had been or was intended to be used in the furtherance of unlawful activity or was an integral part of such activity. *N.J.S.A.* 2C:64–1 to –9.

On May 18, 1994, the Ocean County Grand Jury returned an indictment against Blight and Kenneth Jones (defendant) charging them with third degree conspiracy to distribute marijuana, in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–5b(11) (count one); fourth degree possession of marijuana in excess of fifty grams, in violation of *N.J.S.A.* 2C:35–10a(3) (count four); and third degree possession of marijuana with intent to distribute, in violation of *N.J.S.A.* 2C:35–5a(1) and 5b(11) (count five). The indictment also charged Blight with fourth degree distribution of marijuana, in violation of *N.J.S.A.* 2C:35–5b(12) (counts two and three).

## I.

This case arises from the distribution of marijuana from Blight's residence during September and October 1993. Prior to trial, the trial court accepted Blight's and defendant's waiver of a jury trial. By consent of all parties, the trial court consolidated the forfeiture and criminal actions for purposes of trial. Immediately following the opening statements of counsel, Blight entered an unconditional plea of guilty to all but count one of the indictment.

Earlier that year, in an unrelated drug transaction, Richard Ashworth was arrested for drug-related activities and pleaded guilty to the charge of conspiracy to distribute marijuana. The State agreed to recommend a probationary sentence in exchange for Ashworth's cooperation with the Strike Force with regard to an investigation of suspected drug activity at 318 Ash Road. Specifically, Ashworth was instructed to arrange and conduct controlled purchases of marijuana from Blight while wearing a wireless body transmitter and using currency furnished by investigators.

During the trial the State offered the following evidence. During his conversation with Blight on the afternoon of September 7,

1993, Ashworth arranged to purchase marijuana at Blight's residence later that evening. After Ashworth arrived at Blight's residence, she asked him to "step into my office," referring to the master bedroom. After proceeding into the master bedroom with Blight, Ashworth asked to purchase an eighth of an ounce of marijuana and Blight provided him with a clear plastic zip-lock bag containing marijuana.

On September 21, 1993, Ashworth arranged a second controlled purchase of marijuana from Blight. Upon arriving at her house that evening, Ashworth and Blight discussed at length whether Blight's source could secure large quantities of marijuana to be purchased by Ashworth. Blight noted that with regard to her drug transactions, "everybody makes a buck." During the conversation, Blight walked into the master bedroom while Ashworth remained in the living room. That evening Ashworth purchased sixth-eighth's of an ounce of marijuana from Blight.

On September 30, 1993, Ashworth again arrived at Blight's house and was greeted at the door by defendant. Defendant, Ashworth and Blight then proceeded to the master bedroom where Ashworth and Blight again discussed the possibility of her source obtaining a large quantity of marijuana and the appropriate price for it. At one point, defendant noted that Blight's source was "very shaky to say the least." As Ashworth and Blight continued to discuss the price of the marijuana, defendant, while sitting on a platform bed, interjected, "You almost feel better about it when somebody is gonna do it for nothin', if somebody is gonna go it for nothin', ya know what I mean," and observed that, "Nobody is doin' dick for nothin'." While in the bedroom, Ashworth observed various quantities of marijuana in a gray strongbox which Blight removed from underneath the bed and then unlocked. Ashworth could see that the box contained various papers, including a piece of paper with his name written on it that reflected the amount of money he owed to Blight for the marijuana.

On October 7, 1993, Ashworth returned to Blight's house. Again defendant was present. As Ashworth, Blight and defendant stood together in the kitchen, Blight extolled the virtues of the marijuana she possessed and indicated that she and defendant had just smoked a thin joint and gotten high. Defendant added that "It's good pot," and stated that he was surprised by its potency. When Ashworth asked Blight if she was willing to sell marijuana in the amount of "eight-eighths," defendant repeated "eight-eighths." Defendant later asked Blight if her source had "come here to personally" sell her the marijuana.

Based upon the information gathered by Ashworth, investigators obtained a search warrant for Blight's residence, which they executed at approximately 7:00 p.m. on October 28, 1993. During a search of the bottom drawer of an unlocked filing cabinet located in the master bedroom, Investigator Jeffrey Vogt discovered a one-pound bag of marijuana. The investigator then uncovered a locked strongbox located directly underneath the bag of marijuana. He did not recall that any of the interior doors of the residence were locked when the search warrant was executed.

While searching the master bedroom, Investigator Michael Franzoso observed in plain view a second plastic bag of marijuana, later found to weigh one-half pound, atop the bed's headboard. He also found a triple-beam scale on the floor of the bedroom. In addition, the investigator recovered from the master bedroom a film container filled with foil-wrapped marijuana, a bag of marijuana cigarettes and assorted narcotics paraphernalia.

Investigators then attempted to locate the key to the locked strongbox. Keys obtained from Blight and defendant did not fit the lock. While searching underneath the cushions of a couch in the living room, Sergeant Jeffrey Bissey located keys. Blight, who was observing the search, exclaimed, "Oh, you found my keys. They've been lost for approximately two months," and thanked him. The sergeant opened the locked box with one of the keys and discovered bank envelopes containing $36,000 in currency. Each envelope was marked with a figure that corresponded with

the amount of currency contained therein. Another $610 was recovered from Blight's purse during the search.

On November 5, 1993, Investigator Scott Haemmerle examined each envelope found in the strongbox to ascertain whether the serial numbers of the currency seized matched those on the currency previously furnished to Ashworth to conduct the controlled buys. Of the nineteen $20 bills, two $10 bills, and one $50 bill provided to Ashworth for the controlled buys on September 7 and 21, the investigator discovered the same $50 bill in an envelope numbered "sixteen." The investigator contemporaneously noted the match on the confidential fund expense voucher he was required to complete.

Sergeant Jeffrey Harper of the Strike Force, an expert in narcotics and narcotics trafficking, testified that given the facts of this case, the marijuana found in Blight's bedroom was possessed for distribution purposes and not for personal use. With respect to the $36,000 found underneath the one-pound bag of marijuana in Blight's filing cabinet, Sergeant Harper stated that in his sixteen years of experience, he frequently observed that drug dealers hide their proceeds to avoid detection by police and customers intent on robbing them. According to Sergeant Harper, drug dealers rarely deposit the proceeds of their illegal activities in banks or other financial institutions in their effort to avoid creating a "paper trail" from which authorities could be alerted to their illicit conduct. Lastly, Sergeant Harper testified that the price of one pound of marijuana was generally $1,200 to $1,600 and that a dealer could readily generate a net profit of $4,540 by selling the marijuana in one-eighth ounce quantities for $30.

Blight and defendant elected to testify at their joint trial. According to Blight, she first became acquainted with defendant in 1980 when she moved to 318 Ash Road and became his neighbor. She and defendant became "emotionally dependent on each other" and intimate in their relationship after defendant's wife left him in 1983. Defendant briefly moved in with her at 318 Ash Road for

several weeks in the mid–1980's. Blight also claimed that prior to October 28, 1993, although defendant would frequently visit her house, his visits were short and he stayed overnight no more than once or twice a month. According to Blight, even though they had been engaged for six years, defendant was living in a bedroom of a next-door neighbor, Charles Suit, when investigators conducted the search of her house on October 28, 1993.[3]

Blight also claimed that she was drug dependent and that defendant had attempted unsuccessfully to secure her admission into various substance-abuse treatment programs prior to the search of her home. She denied that defendant sold drugs, although she acknowledged that he would occasionally smoke a joint with her.

Blight further maintained that her only source of subsistence, aside from dealing drugs, was public and emergency assistance, food stamps, and the occasional sale of puppies and candles. She also claimed that the $610 found in her pocketbook by investigators constituted profits from the sale of candles. Blight acknowledged that defendant "contributed substantial amounts" to her "financial position" and had established a trust account for her containing approximately $7,000.

She further claimed that when she was not home, she would lock the door to her master bedroom with a heavy dead-bolt lock for which she possessed the only key. Blight explained that the strongbox discovered by investigators belonged to defendant, who left the box at her house that morning because they were scheduled to meet with a lawyer to discuss purchasing a house. Although she acknowledged that she, too, possessed a key to the strongbox, Blight maintained that it contained only defendant's money derived from an inheritance. Blight claimed that she had lost her key to the strongbox for two months and did not have access to the strongbox "all the time." She adamantly denied,

---

[3] Subsequent to October 1993 defendant acquired an interest in 318 Ash Road and moved in with Blight on a permanent basis.

however, ever taking money from the box. She later claimed, though, that she would occasionally give defendant her paperwork to keep for her in the box.

Finally, Blight claimed that defendant had no knowledge of the large quantities of marijuana in her bedroom on October 28, 1993, and that she had placed the strongbox in the filing cabinet after visiting the lawyer. She further contended that she told the investigators during the search that the box belonged to defendant and that it contained only his money. Blight also denied profiting from the sale of marijuana, claiming that she turned over all proceeds to her source, whom she identified as her brother, in exchange for marijuana for her personal use.

During cross-examination, Blight acknowledged that defendant had applied for and obtained a credit card for which they were both jointly liable. Blight also conceded that defendant was aware that she was selling marijuana but asserted that he disliked Ashworth because defendant "pretty much caught on to what was going on" and "never discussed marijuana" with her or Ashworth "ever." She further stated that defendant would only smoke marijuana when "enticed" by her to do so.

Blight claimed that defendant usually carried the strongbox with him and would entrust it to her only when he stayed at her house or "for some reason," which was "hardly ever." Later, however, she testified that she kept her son's bonds in the box as well as her passport and birth certificate and "possibly" those of her children. She denied stating to an investigator, "That's my money, I've been saving that for a long time," when the strongbox was opened in the living room during the search.

When asked by the trial court whether she or defendant dominated their relationship, Blight asserted that she did and "still do[es]." Immediately thereafter, she denied having any control whatsoever over defendant's strongbox. Blight further explained that defendant did not possess the key to her bedroom because "nothing of his was in there" and he was not permitted there without her permission. She admitted, however, that she and

defendant had been engaged for six years and that defendant purchased an interest in her residence at 318 Ash Road in May 1994.

Blight acknowledged misrepresenting information on her application for public assistance in September 1992 by failing to disclose her trust account established by defendant. Blight also reluctantly conceded that defendant would occasionally deposit personal checks and paychecks into her bank account.

According to defendant, from 1982 to 1987, he resided at 321 Ash Road before selling the house for a profit of $1,264, which he kept in his strongbox. He also identified a deposited check in the amount $9,897.02 which he claimed was given to him by his mother following his father's death in February 1987. He said he withdrew the entire amount from the bank and kept it in his strongbox. He further identified a letter dated December 11, 1987, from an estate attorney which reflected a $2,310.46 advance on his inheritance following the death of his mother. Defendant claimed that he deposited that check, waited until it cleared, then withdrew the entire balance and added it to the money in his strongbox. When presented with his bank records obtained from Southern Ocean State Bank, he indicated that an initial deposit of $20,000 reflected in a statement constituted the bulk of his inheritance, which he gradually withdrew and kept in his strongbox. Finally, defendant testified that in July 1990 he established a trust account for Blight using $5,410.68 he had withdrawn from a pension plan.

He further maintained that the funds he had accumulated remained in his strongbox and that he would take the box with him wherever he went. Although he "never really completely felt safe" when he carried the box, he nonetheless believed it was "very safe" at Blight's house because, according to defendant, she was always home and never went out.

Defendant acknowledged his long-standing engagement to Blight but asserted that prior to and during the search of her residence he had resided in a single bedroom rented from Charles

Suit at 320 Ash Road. He admitted that he did not pay rent but did perform services for Suit and bought food. However, defendant conceded that he listed 318 Ash Road as his place of residence when applying for employment with the Taj Mahal Casino prior to the search of Blight's home. He provided that same address to the Casino Control Commission when applying for employment with a casino. Defendant also claimed that he received mail at both 318 and 320 Ash Road, as well as at a post office box.

Defendant knew that Blight customarily kept her supply of marijuana in the master bedroom, but he disavowed any knowledge of the exact location. He also denied ever witnessing Blight selling marijuana to Ashworth. According to defendant, whenever he expressed his disapproval of Blight's drug dealing activities, she told him not to worry about it and to mind his own business. Although defendant claimed that he had previously contacted various agencies regarding possible substance-abuse treatment for Blight, he admitted that he occasionally smoked marijuana with her and acknowledged sharing a joint with her just before Ashworth's visit on October 7, 1993.

On October 28, 1993, defendant took the day off as a security guard at the Taj Mahal Casino to perform some errands with Blight. He claimed that when he arrived at her house that morning, he gave her his strongbox to lock up before visiting Suit's attorney to discuss the purchase of Suit's home. Defendant maintained that he did not have a key to the master bedroom of Blight's house, nor did he enter the bedroom at any time the preceding week.

On cross-examination, defendant conceded that Blight possessed the key to the strongbox for approximately one year before the search of her home. With respect to the $1,264 realized from the sale of defendant's first home, defendant claimed to have forgotten that $500 of the proceeds was paid to his former wife and the remaining amount was held in escrow to be paid to the Burlington County Welfare Board. Defendant further claimed that he earned

between $200 and $225 per week net plus tips from 1987 to 1989 when he pumped gas before being hired by the Taj Mahal Casino in 1989.

When questioned as to why he allegedly withdrew his inheritance from the bank and kept it in the strongbox, defendant claimed that he distrusted financial institutions after encountering legal difficulties with the distribution of his parents' estate in 1987. However, when confronted with a bank statement dated September 30, 1988, showing numerous deposits and withdrawals made by him from July through September 1988, defendant claimed that he "wasn't certain why" he continued to patronize the bank. Indeed, defendant acknowledged opening up both a personal checking account for himself and a trust account for Blight in 1990. Defendant asserted that he had no idea how much money he removed from the box between 1987 and 1990 and claimed that during this period he made no major purchases. He conceded, however, having purchased several used cars, one of them costing over $2,000, paid for with money obtained from the strongbox. He also said that he had paid "from the money that [he] had" the sum of $1,500 to attend school in Atlantic City in order to obtain temporary employment with a casino in Haiti.

Defendant further maintained that despite his fear that his car would be stolen, he nonetheless would leave the strongbox containing approximately $30,000 in the trunk wherever he went. Moreover, although he and Blight were engaged to be married, defendant claimed that he slept in the den area as often as four times a week and only rarely slept in the master bedroom. He also acknowledged receiving mail at Blight's address at least once a week.

Defendant also acknowledged being sentenced in federal district court on August 9, 1990, following his plea of guilty to the crime of making fraudulent demands against the United States for cashing his deceased mother's social security checks. Although ordered to pay restitution to the Social Security Administration as a condition of probation, defendant conceded that he had not paid $4,000 in

outstanding restitution nor had he notified the Social Security Administration that he possessed the money contained in the strongbox. Furthermore, defendant obtained a mortgage for 318 Ash Road on March 29, 1994, despite having had his money seized four months earlier.

When shown various personnel forms pertaining to his employment at the Taj Mahal Casino which he had personally completed and signed in 1990, defendant admitted that he had misrepresented information concerning his address by listing both Blight's address and telephone number as his own. In a notarized letter to the Casino Control Commission dated December 1, 1989, defendant again listed his permanent place of residence since September 1989 as 318 Ash Road. Defendant also listed Blight's telephone number and address on various banking forms when he opened accounts with Collective Federal Savings Bank in 1990.

Lastly, defendant indicated that at the time Blight's house was searched, only the television in the master bedroom worked. He asserted, however, that the master bedroom was "pretty much off limits" and that most of his papers were in his room at 320 Ash Street. Defendant maintained that he would not keep anything important in Blight's master bedroom because he lacked access to it but, nonetheless, would readily leave his strongbox there.

Defendant's daughter, Kelly Hamilton, testified that the strongbox contained money and her father frequently carried it with him. Brenda Molosky, Blight's daughter, testified that she never observed defendant sleeping at her mother's house and she occasionally observed him carrying an off-white or cream-colored box containing envelopes filled with money.

In rebuttal, the prosecutor called Investigator Krista Emerson, who participated in the search of Blight's house. She testified that when investigators opened the strongbox in Blight's presence, Blight stated, "I have been saving that money for a long time." Postman Michael Dibb testified that his postal route included 318 Ash Road and that he had been delivering mail to defendant since

1989. Dibb testified that he had *never* delivered mail to defendant at any address other than 318 Ash Road.

## II.

At the close of the State's case in the joint trial, the trial court denied both Blight and defendant's motions for judgments of acquittal. At the conclusion of the trial on December 22, 1994, the trial court found defendant guilty of fourth-degree possession of marijuana (count four). Defendant was acquitted of the remaining counts of the indictment.[4]

The trial court further ruled that the State had not proven by a preponderance of the evidence that the money seized during the execution of the search warrant constituted proceeds of illegal drug activity. The trial court concluded that the $36,000 seized from the strongbox and the $610 seized from Blight's purse during the search of her home were not the proceeds of illegal narcotics activity and were not used in the furtherance of unlawful activity; therefore, the money was not subject to forfeiture pursuant to *N.J.S.A.* 2C:64-1 to -9. Accordingly, the trial court ordered that the money be returned to defendant. However, because of fraud committed by defendant against the Social Security Administration, the trial court earmarked a portion of the currency for satisfaction of the amount defendant owed to the Social Security Administration. A written order memorializing the court's ruling was filed on February 28, 1995.

On February 17, 1995, defendant filed a motion for reconsideration with respect to the trial court's finding of guilt as to count four. Following a hearing on March 3, 1995, the trial court granted defendant's motion and set aside the verdict because it "wasn't convinced beyond a reasonable doubt . . . that [defendant]

---

[4] The record does not contain any judgment of acquittal of defendant on counts one and five. Blight was acquitted of count one of the indictment.

ever intended to control that stuff." [5]

The State filed notices of appeal from the order entered in the forfeiture action and the order of reconsideration of the finding of defendant's guilt on count four and granting a judgment of acquittal.

## III.

The State contends that there was not sufficient credible evidence in the record to support the trial court's finding that the $36,560 seized by investigators was not subject to forfeiture.

After the presentation of evidence, the trial court explicitly rejected the claim by defendant and Blight that defendant carried the strongbox with him at all times. The trial court further dismissed defendant's thoroughly repudiated assertion that he distrusted banks and therefore never utilized them. Nonetheless, the trial court accepted as credible defendant's claim that the money in the strongbox belonged to him rather than Blight, and further concluded, without elaboration, that defendant had accurately identified legitimate sources of the money through his financial records.

Significantly, the trial court never distinguished the $610 found in Blight's purse from the $36,000 discovered in the strongbox. Nor did the trial court address the fact that since Blight pleaded guilty to two counts of distribution of marijuana at the onset of the proceedings, there existed a rebuttable presumption that the $610 was utilized in furtherance of an unlawful activity and therefore subject to forfeiture under *N.J.S.A.* 2C:64–3j.

---

[5] At that point, based upon defendant's admission that he smoked marijuana with Blight, the prosecutor asked the trial court to consider the lesser-included offense of failing to deliver a controlled dangerous substance to the nearest law enforcement officer in violation of *N.J.S.A.* 2C:35–10(c). The trial court found defendant not guilty of that offense as well. The State has not appealed from that decision.

Notwithstanding its acknowledgement that investigators had seized a considerable quantity of marijuana at Blight's residence, the trial court characterized her sale of marijuana as a "ham and egg operation." Based on Blight's uncorroborated testimony that her distribution of marijuana was confined "to people across the street," the trial court further concluded that the size of her trafficking operation was inconsistent with the scale necessary to generate the $36,000 recovered from the strongbox.[6] The trial court's finding that possession of one and one-half pounds of marijuana equated to a "two-bit operation" appears to have derived from the undue emphasis it placed upon the alleged dominance of Blight over the defendant. For example, the trial court repeatedly remarked that Blight was "the dominant personality," who "sought to drag [defendant] down with her under the circumstances." In disregarding persuasive evidence that defendant, in fact, resided with Blight when her house was searched, the trial court stated: "Again, I'll say, believe it or not—I believe it in this case—she is so dominant, I'm convinced, that he roomed next door. He wasn't living there." After assessing defendant as "generally a productive person" who meekly acquiesced in Blight's criminal activities, the trial court once more emphasized that Blight "dominated" their relationship. Based upon these findings, the trial court refused to order forfeiture.

## IV.

An appellate court is bound by a trial judge's determination of credibility and those findings of fact which are reasonably supported by sufficient and credible evidence. *State v. Seven Thousand Dollars,* 136 *N.J.* 223, 243, 642 *A.*2d 967 (1994) (O'Hern J., dissenting); *Rova Farms Resort, Inc. v. Investors Ins. Co. of*

---

[6] The trial court's statement on December 22, 1994, that it believed Blight's assertion that her buyers were limited to "people across the street" is totally insupportable given that only two days earlier, it had accepted her pleas of guilty to two counts of fourth degree distribution of marijuana based on her sales of marijuana to Ashworth on September 7 and 21, 1993.

*Am.,* 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). When, however, the focus of the contested evidence is on the judge's evaluation of the underlying facts and implications to be drawn therefrom, this court has held that the appellate function "broadens somewhat." *C.B. Snyder Realty Inc. v. BMW of N. Am. Inc.,* 233 *N.J.Super.* 65, 69, 558 *A.2d* 28 (App.Div.), *certif. denied,* 117 *N.J.* 165, 564 *A.2d* 883 (1989). Where an evaluation of the record leaves the reviewing court " 'with the definite conviction that the judge went so wide of the mark that a mistake must have been made,' " that court may " 'appraise the record as if [it] were deciding the matter at inception and make [its] own findings and conclusions.' " *Ibid.* (quoting *Pioneer Nat'l Title Ins. Co. v. Lucas,* 155 *N.J.Super.* 332, 338, 382 *A.2d* 933 (App.Div.1978)).

Applying this standard, the trial court's decision denying forfeiture was totally unsupported by the facts and will be given no deference. The decision ignored the overwhelming evidence by the State, including defendant's own certification to State authorities as to his residence, and the trial court chose to accept testimony—bordering on the incredible—of witnesses who were either interested in the proceeding or so close to the interested parties as to have a clear capacity to be biased. We believe that the logical conclusion that can be drawn from the credible evidence is that on October 28, 1993, defendant lived with his long time fiancée at 318 Ash Road; and, therefore, there was a direct causal relationship between the $36,000 and the sales of marijuana sufficient to render the money subject to forfeiture. By ruling otherwise, the trial court clearly missed "the mark."

The provision of the Code of Criminal Justice authorizing the civil forfeiture of property, *N.J.S.A.* 2C:64–1a, provides that property is forfeitable if it consists of

(1) Controlled dangerous substances, firearms which are unlawfully possessed, carried, acquired or used, illegally possessed gambling devices, untaxed cigarettes and untaxed special fuel. These shall be designated prima facie contraband.

(2) All property which has been, or is intended to be, utilized in furtherance of an unlawful activity, including, but not limited to, conveyances intended to facili-

tate the perpetration of illegal acts, or buildings or premises maintained for the purpose of committing offenses against the State.

(3) Property which has become or is intended to become an integral part of illegal activity, including, but not limited to, money which is earmarked for use as financing for an illegal gambling enterprise.

(4) Proceeds of illegal activities, including, but not limited to, property or money obtained as a result of the sale of prima facie contraband as defined by subsection a.(1), proceeds of illegal gambling, prostitution, bribery and extortion.

When non-prima facie contraband, also known as derivative contraband, is involved, the State must prove by a preponderance of the evidence that the seized property, here the $36,560, was subject to forfeiture because it was used "in furtherance of" or "to facilitate the perpetration of" or as "an integral part of" the illegal act. *N.J.S.A.* 2C:64–1a. *State v. Seven Thousand Dollars, supra,* 136 *N.J.* at 233–34, 642 *A.*2d 967. The State must therefore demonstrate a direct causal relationship between the use of the property and the illegal activity. *Id.* at 234, 642 *A.*2d 967; *State v. One 1986 Subaru,* 120 *N.J.* 310, 320, 576 *A.*2d 859 (1990). "The connection connotes a sense of dependency; a merely casual relationship will not suffice." *State v. Seven Thousand Dollars,* 136 *N.J.* at 234–35, 642 *A.*2d 967. In those cases in which currency has been forfeited as derivative contraband, "the connection to illegal activity is often grounded in the money's proximity to prima facie contraband, such as controlled dangerous substances, or admitted past or planned illegal activity." *Id.* at 235, 642 *A.*2d 967.

The currency seized by investigators in the present case obviously could not have been in closer proximity to the marijuana: the strongbox containing the $36,000 was discovered resting directly underneath a one-pound bag of marijuana in the bottom drawer of a filing cabinet in Blight's master bedroom, the same room where she conducted her transactions with Ashworth approximately one month before the search. Authorities also discovered in that same room an Ohaus triple-beam scale commonly used to measure narcotics, assorted narcotics paraphernalia and an additional one-half pound bag of marijuana. In rejecting the

inescapable inference that the money, in fact, constituted proceeds from Blight's sale of marijuana or, alternatively, was utilized in some manner in the furtherance of her distribution operation, the trial court disregarded ample evidence that established Blight's control and use of the strongbox and its contents. For instance, she had the key to the strongbox which she kept in her locked bedroom, and she refused to give defendant the key to her bedroom or the right to enter it without her permission.

Most significantly, the trial court entirely discounted the testimony of Investigator Haemmerle who testified that a $50 bill given to Ashworth to conduct a controlled purchase of marijuana from Blight was discovered in an envelope in the strongbox during the search of her home. This testimony alone established that Blight controlled the box and utilized it during the course of her criminal endeavors. Similarly, the trial court disregarded without comment Ashworth's testimony that Blight opened an unlocked strongbox in his presence while in the master bedroom and removed a piece of paper reflecting the amount of money he owed Blight for the marijuana.

Blight's utilization of the box was further established by the testimony of investigators who executed the search of Blight's residence on October 28, 1993. Sergeant Bissey testified without contradiction that when he attempted to unlock the strongbox using keys found in the residence, *including keys removed from defendant's person*, none fit the lock. However, when Bissey discovered the key ring in the couch, Blight stated, "Oh, I've been looking for those keys." Investigator Emerson testified that when the box was opened in her presence, Blight exclaimed that she had been saving that money "for a long time." Moreover, it is uncontroverted that when opened, the strongbox was bereft of any personal papers or effects, although Blight and defendant each testified that such documents were usually kept in the strongbox.

In thoroughly insulating defendant from Blight's drug dealing, the trial court apparently disregarded the uncontested fact that Blight and defendant had been engaged for six years prior to the

search and, as evidenced by their joint credit card and the establishment of Blight's trust account, obviously commingled their assets. Notwithstanding the trial court's finding to the contrary, the State conclusively established that, at a minimum, defendant construed Blight's house as his permanent place of residence prior to and during the period in which Blight sold the marijuana to Ashworth. Defendant's financial and employment records, including a signed and notarized letter to the Casino Control Commission, all disclosed that defendant listed Blight's address and telephone number as his own. Aside from the testimony of defendant's and Blight's family members, defendant presented no corroboration whatsoever that he lived someplace other than at 318 Ash Road from 1989 through 1993. The court chose to ignore the best evidence of residence, that of the United States postman who, since 1989, delivered defendant's mail only to 318 Ash Road.

The transcripts of Ashworth's conversation with Blight and defendant on September 21, 1993, and October 7, 1993, belie defendant's assertion, accepted by the trial court, that he objected to Blight's illegal activities and her frequent use of marijuana. Defendant did not present any corroborative evidence that he had endeavored to secure substance-abuse treatment for Blight. Defendant's own admitted use of marijuana with her renders any such claim highly suspect. Moreover, if, as the trial court concluded, Blight so thoroughly dominated defendant, it necessarily follows that she also asserted control over his strongbox and the currency therein.

The trial court also ignored the fact that although defendant had deposited and then withdrawn his alleged inheritance from Southern Ocean Bank in 1988, the envelopes recovered from the strongbox were from Collective Federal Savings Bank. In addition, five of the envelopes were dated January 1992 and two were dated March 1993. Even the $610 recovered from Blight's purse was contained in Collective Federal Savings Bank envelopes.

The cross-examination by the prosecutor clearly demonstrated that neither Blight nor defendant were reluctant to dissembling when it suited their interests. The trial court itself dismissed as undeserving of belief several significant assertions made repeatedly by defendant, a convicted felon, and Blight, an admitted liar, relating to the strongbox. Although both also admitted defrauding government agencies, the trial court stated that "I cannot permit that to affect my judgment." We are at a loss to understand how the trial court nevertheless credited defendant's self-serving claim of sole ownership of the strongbox and currency therein. Moreover, it is not credible that someone such as defendant would keep $36,000 in cash in a room to which he did not have ready access.

The trial court's finding that the strongbox and currency seized by investigators were unconnected to Blight's distribution operation is clearly not supported by adequate substantial and credible evidence. By statute,

> [e]vidence of a conviction of a criminal offense in which seized property was either used or provided an integral part of the State's proofs in the prosecution shall be considered in the forfeiture proceeding as creating a rebuttable presumption that the property was utilized in furtherance of an unlawful activity.
>
> [*N.J.S.A.* 2C:64-3j.]

A wealth of evidence convincingly established by a preponderance of the evidence that the $36,610 (including the $50 from the controlled purchase) was not acquired from legitimate sources but rather was derived from, or formed an integral part of, the sales of large quantities of marijuana conducted from Blight's residence for which she was ultimately prosecuted and pled guilty. The contradictory statements of Blight and defendant on how and when the strongbox happened to be in Blight's file cabinet on the day of the search underscores the strength of the evidence against them and undermines the credibility of both.[7]

---

[7] When explaining on direct and cross-examination how the strongbox got into the file cabinet, Blight stated that she "went in the house and put the box away" after she and defendant had visited a lawyer that morning regarding a "cash

The factual findings which undergird the judgment denying forfeiture are not supported by adequate, substantial and credible evidence and are so wholly insupportable as to result in a denial of justice. *In re J.T.*, 269 *N.J.Super.* 172, 188, 634 *A.*2d 1361 (App.Div.1993). Therefore, the State was clearly entitled to the $36,560 seized.

## V.

The State contends that the trial court erred in setting aside its finding of defendant's guilt because there was overwhelming credible evidence to warrant a finding of constructive possession by defendant.

At the conclusion of the trial on December 22, 1994, the trial court found sufficient evidence that defendant was guilty of possessing marijuana discovered in Blight's master bedroom under a theory of constructive possession. Specifically, the court found that defendant "had constructive possession of the marijuana, if not on this date, on dates close to it" since he "had the ability to exercise control over that marijuana" and was not denied access to it as claimed by defendant and Blight. The court accordingly found defendant guilty of fourth degree possession of marijuana.

Seventy-two days later, at a hearing held on March 3, 1995, the court entertained defendant's motion for reconsideration[8] of its previous finding of guilt with respect to count four. What is difficult to understand is that the trial court knew, as it stated during the summations, that the principal issue was "whether or

deal" involving the purchase of a house. Defendant, however, testified that before going to visit the lawyer, he "handed [the box] to her and asked her to lock it up for me."

[8] In defendant's supporting brief, defendant's attorney improperly stressed the importance of the penalty to defendant, stating, "In addition, he will lose his driver's license, *leaving both him and Mrs. Blight without transportation.*" (Emphasis added.) We will never know if this had an effect, consciously or otherwise, on the trial court's decision to reverse itself.

not there was an intention [by defendant] to exercise control or dominion" over the marijuana. Despite defendant's admitted use of marijuana with Blight, the trial court stated:

> I sat and listened to all the evidence in the case, and I think there was testimony, and correct me, [prosecutor], if I'm wrong, that I think there were—there was an admission that he had a joint with her on one or two occasions. And it became apparent to me from all of his testimony who is the dominant person—underline the word dominant—with regard to this whole relationship.
>
> . . . .
>
> The fact that he had one or two joints, and I'm convinced that, based upon what I heard, he wasn't the guy that went in there and got them and rolled them and whatever. He—this was her stuff. In plain English. This was her stuff.
>
> The bottom line is, I was wrong. I kind of "thunk" it at the time. It was no accident where I didn't say that he intended to possess it. I don't I—was struggling with that. And I say here, for all to hear, that I, obviously, wasn't convinced beyond a reasonable doubt, and I go no further than that.
>
> I wasn't convinced beyond a reasonable doubt that he ever intended to control that stuff. There was . . . no credible testimony that he ever did.
>
> That was her stuff. She was trying to really get him to be a user, user, user. And he puffed a couple of joints—not to minimize that—on a couple of occasions. And for that—for me to say—it's a broad jump from there to say he possessed a pound and a half of stuff on that other day.

Thereafter, the court granted defendant's motion and set aside the verdict because it "wasn't convinced beyond a reasonable doubt that [defendant] ever intended to control that stuff."

Criminal possession of an item signifies "intentional control and dominion, the ability to affect physically and care for the item during a span of time," *State v. Davis*, 68 *N.J.* 69, 82, 342 *A.2d* 841 (1975), accompanied by knowledge of its character. *State v. Brown*, 80 *N.J.* 587, 597, 404 *A.2d* 1111 (1979); *State v. Reed*, 34 *N.J.* 554, 557, 170 *A.2d* 419 (1961). Possession may be either actual or constructive. *N.J.S.A.* 2C:35–10a. By definition, proof of constructive possession relies almost exclusively upon circumstantial evidence. As set forth by the Supreme Court of New Jersey in *State v. Brown*, *supra*, physical or manual control over the item itself is not required. All that is necessary is "an intention to exercise control over [the item] manifested in circumstances where it is reasonable to infer that the capacity to do so exists." 80 *N.J.* at 597, 404 *A.2d* 1111. The concept of construc-

tive possession permits several persons to jointly possess an object simultaneously. *State v. Foreshaw,* 245 *N.J.Super.* 166, 186, 584 *A.*2d 832 (App.Div.), *certif. denied,* 126 *N.J.* 327, 598 *A.*2d 886 (1991).

As a general proposition, criminal possession may not be inferred from a defendant's mere presence at the location where contraband is found. *State v. Brown, supra,* 80 *N.J.* at 593, 404 *A.*2d 1111. To justify such an inference, there must be " 'other circumstances ... tending to permit such an inference to be drawn.' " *Ibid.* (citation omitted); *State v. Shipp,* 216 *N.J.Super.* 662, 665, 524 *A.*2d 864 (App.Div.1987). For example, evidence that a person had actually possessed contraband prior to its discovery may be admitted to demonstrate his or her constructive possession on the occasion charged. *State v. Cofield,* 127 *N.J.* 328, 339–40, 605 *A.*2d 230 (1992).

In applying this standard to the facts adduced at trial, the trial court should not have set aside its finding of defendant's guilt since the evidence and available inferences amply supported its original conclusion that defendant constructively possessed the marijuana beyond a reasonable doubt. Indeed, the facts adduced at trial were analogous to those examined in *Brown.* There, the Court concluded that evidence presented by the State at trial was sufficient to permit the jury to draw the inference that defendant was in constructive possession of narcotics discovered in a dress located in the bedroom closet of an apartment. Specifically, the State established at trial that defendant resided at the apartment and had permitted officers to enter it upon the execution of a search warrant. *State v. Brown, supra,* 80 *N.J.* at 590–91, 404 *A.*2d 1111. Here, whether or not defendant resided at 318 Ash Road, there was ample circumstantial evidence that he constructively possessed the marijuana on October 28, 1993.

Furthermore, in *State v. Brown,* the Court noted that the presence of narcotics paraphernalia in the apartment and the observation by police officers of known and suspected narcotics users frequenting the apartment over a three-day period further

served to strengthen the inference of defendant's knowledge and control of the concealed heroin. *Id.* at 595–97, 404 *A.*2d 1111.

Here, as in *Brown,* defendant was on the premises when the marijuana was discovered and "[t]here were other evidential circumstances lending distinctive color to the character of defendant's presence at the scene." *Id.* at 594, 404 *A.*2d 1111; *see State v. Milton,* 255 *N.J.Super.* 514, 523, 605 *A.*2d 757 (App.Div.1992). For example, defendant acknowledged smoking marijuana with Blight at her residence on October 7, 1993, less than one month before the search of the residence, and on several previous occasions. Indeed, while in the presence of Ashworth on October 7, defendant characterized the marijuana he had just smoked as potent and of good quality. Moreover, defendant acknowledged his awareness of Blight's drug-dealing activities and the presence of her personal supply of marijuana in the master bedroom, the same bedroom he claimed to have slept in at least once or twice a month. He further acknowledged sleeping in the den area of Blight's house as often as four times a week.

For some inexplicable reason, the court discounted the substantial and compelling evidence that defendant, in fact, resided with Blight, his long-time fiancée, prior to and during the period in which her residence was searched and was present during two drug sales to the State's informant. Moreover, the trial court's ultimate decision that defendant did not constructively possess the marijuana is in startling contrast to its decision that defendant had sole possession of the strongbox lying underneath a one-pound bag of marijuana in Blight's bedroom to which he did not have a key.

Viewing the evidence in its entirety, the trial court was certainly entitled and perhaps even compelled to draw the inference of intent, knowledge and control of the marijuana by defendant at the time of execution of the search warrant on October 28, 1993. There was no insufficiency of evidence. *See State v. Berry,* 140 *N.J.* 280, 303, 658 *A.*2d 702 (1995). The best evidence that there were sufficient proofs to preclude the setting aside of the verdict of guilt based upon insufficient evidence lies in the fact that if this

matter had been tried to a jury, the judge could not have granted a motion for a judgment of acquittal at the end of the State's case nor after all the evidence had been closed pursuant to *R.* 3:18–1. The trial court's finding to the contrary is clearly a mistaken one and is so plainly unwarranted that the interests of justice demand our intervention and correction. *See State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964).

Because the trial court's setting aside of its finding of guilt was so wide of the mark, we reverse it, reinstate the finding of guilt and remand the matter for sentencing.

## VI.

Defendant argues that the State's appeal of his acquittal is barred by the principle of double jeopardy. The defendant misstates the issue involved herein, which is whether the State may appeal a trial court's setting aside of its finding of guilt when there was sufficient evidence to justify the conviction.

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides that no persons shall be "subject for the same offence to be twice put in jeopardy of life or limb." *U.S. Const.* amend. V. The language of its New Jersey constitutional counterpart provides that "[n]o person shall, after acquittal, be tried for the same offense" and has been held to be fully coextensive in scope and application with the federal prohibition against double jeopardy. *N.J. Const.* art. I, ¶ 11; *State v. Farmer,* 48 *N.J.* 145, 168, 224 *A.*2d 481 (1966), *cert. denied,* 386 *U.S.* 991, 87 *S.Ct.* 1305, 18 *L.Ed.*2d 335 (1967); *State v. Ortiz,* 202 *N.J.Super.* 233, 240, 494 *A.*2d 822 (App.Div.), *certif. denied,* 102 *N.J.* 300, 508 *A.*2d 187 (1985).

Double jeopardy protection is afforded in three distinct circumstances. "The double jeopardy guarantees protect against a second prosecution for the same offense after acquittal or after conviction, and against multiple punishments for the same offense." *State v. Darby,* 246 *N.J.Super.* 432, 438, 587 *A.*2d 1309

(App.Div.), *certif. denied,* 126 *N.J.* 342, 598 *A.*2d 898 (1991). However, when a judge rules in favor of a defendant after a verdict of guilty has been entered by the trier of fact, the State may appeal from that ruling without running afoul of the Double Jeopardy Clause. *State v. Lynch,* 79 *N.J.* 327, 341, 399 *A.*2d 629 (1979) (citing *United States v. Wilson,* 420 *U.S.* 332, 95 *S.Ct.* 1013, 43 *L.Ed.*2d 232 (1975)); *State v. Tropea,* 78 *N.J.* 309, 314, 394 *A.*2d 355 (1978). This exception to the double jeopardy bar derives from the recognition that when a verdict of conviction is improvidently set aside, appellate reversal does not expose a defendant to further proceedings because it has the automatic effect of reinstating the jury verdict. *State v. Lynch,* 79 *N.J.* at 341, 399 *A.*2d 629. In short, the specific vice sought to be prevented by the Double Jeopardy Clause—successive and vexatious prosecutions for the same criminal act—is simply not implicated under such circumstances.

Of particular import to this case is the recognition by the United States Supreme Court that the aforementioned exception to the double jeopardy bar is equally applicable to a finding of guilt which is set aside following a bench trial. In *United States v. Morrison,* 429 *U.S.* 1, 97 *S.Ct.* 24, 50 *L.Ed.*2d 1 (1976), the Court explicitly construed a District Court's general finding of guilt following a bench trial as the approximation of a verdict of guilty for purposes of double jeopardy. Specifically, the Court stated:

> "Since the Double Jeopardy Clause of the Fifth Amendment nowhere distinguishes between bench and jury trials, the principles given expression through that Clause apply to cases tried to a judge. . . .
>
> "A general finding of guilt by a judge may be analogized to a verdict of 'guilty' returned by a jury."
>
> [*Id.* 429 *U.S.* at 3, 97 *S.Ct.* at 26, 50 *L.Ed.*2d at 4 (quoting *United States v. Jenkins,* 420 *U.S.* 358, 365–66, 95 *S.Ct.* 1006, 1011, 43 *L.Ed.*2d 250, 257 (1975)) ].

Likewise, the trial court's disposition of defendant's motion for reconsideration in the present case, months after the finding of guilt, obviously constituted the functional equivalent of a judgment of acquittal entered in accordance with *R.* 3:18–2 following a jury verdict of guilty. Consequently, the State is entitled to appeal the setting aside of the verdict since success on the appeal would

result only "in the reinstatement of the general finding of guilt, rather than in further factual proceedings relating to guilt or innocence," *United States v. Morrison*, 429 *U.S.* at 3–4; 97 *S.Ct.* at 26, 50 *L.Ed.*2d at 4. *See R.* 2:3–1(b)(3); *State v. Lynch*, 79 *N.J.* at 341–42, 399 *A.*2d 629.

The trial court did not, as claimed by defendant, set aside its finding of guilt because of insufficient evidence. In addressing defendant's motion for judgments of acquittal at the close of the State's case on December 21, 1994, the trial court was afforded an opportunity—contemporaneous with the elicitation of the evidence—to consider the State's proofs in light of the standard set forth in *State v. Reyes*, 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967). Significantly, it denied the motion for judgments of acquittal as to all counts in the indictment.

Furthermore, when the trial court originally found defendant guilty of possessing marijuana in Blight's master bedroom, it explicitly acknowledged that based upon the State's proofs, an inference could readily be drawn that defendant "had constructive possession of the marijuana" since he "had the ability to exercise control over that marijuana" and was not denied access to it as claimed by defendant and Blight. Months later, the trial court inexplicably based its rejection of that same inference on the interlocking and self-serving testimony of defendant and Blight, which it deemed credible. This testimony obviously was given to insulate defendant from Blight's admitted wrongdoing. Because the trial court months later apparently disagreed with its own original resolution of the conflicting evidence presented at trial, it impermissibly changed its mind in the face of amply sufficient evidence. In fact, we believe that the evidence was not only sufficient but, when considered in its entirety, it fairly reeks of defendant's guilt of constructive possession of the marijuana.

Based upon the State's factual evidence and expert testimony, *State v. Berry*, *supra*, 140 *N.J.* at 303, 658 *A.*2d 702; *State v. Reyes*, *supra*, 50 *N.J.* at 458–59, 236 *A.*2d 385, the defendant was not entitled to a judgment of acquittal after presentation of the

State's case; therefore, the motion for reconsideration must be considered as a motion for a judgment of acquittal notwithstanding the verdict.

The trial court never mentioned the words "against the weight of the evidence," but that was really the basis for setting aside the finding that defendant was guilty. In *Tibbs v. Florida,* 457 *U.S.* 31, 44, 102 *S.Ct.* 2211, 2219, 72 *L.Ed.*2d 652, 663 (1982), the United States Supreme Court unequivocally held that when a verdict is set aside by a reviewing court as being against the weight of the evidence, the Double Jeopardy Clause does not bar retrial for the same offense. Therefore, the mere reinstatement of the trial court's initial and correct finding of guilt would neither violate the Double Jeopardy Clause nor implicate—much less negate—the concerns embodied therein. Accordingly, the State is not foreclosed on double jeopardy grounds from seeking review of the court's dismissal.

The Double Jeopardy Clause does not shield defendant from review of the trial court's patently erroneous conclusion that its earlier finding of guilt was not sustained by the weight of the evidence adduced at the trial. Therefore, we reverse and vacate the March 3, 1995, judgment of acquittal, reinstate the trial court's initial finding of guilt with respect to count four and remand so that the trial court can reinstate the finding of guilt on count four, charging defendant with fourth degree possession of marijuana, and sentence defendant.

We also reverse the trial court's order denying forfeiture and remand to the trial court to enter an order of forfeiture of the currency in the amount of $36,560.