678 A.2d 1191

GARDEN PARK MOBILE HOME OWNERS ASSO. AND THOMAS
LONGETTE, PLAINTIFF, v. GARDEN PARK ASSOCIATES,
A NEW JERSEY PARTNERSHIP, DEFENDANT.

Superior Court of New Jersey
Law Division Monmouth County

Decided February 14, 1996.

*Ronald Schwartz*, for plaintiffs.

*Gary S. Rothstadt*, for defendant (*Bray, Chiocca, Rappaport & Rothstadt*, attorneys).

## OPINION

LOCASCIO, J.S.C.

This case involves the unique circumstances of mobile home living. Plaintiff Garden Park Mobile Home Owners Association (Home Owners) is an unincorporated association of residents of seventy-two of the seventy-eight mobile home units in the Garden Park Mobile Home Park, located in Hazlet, New Jersey. Twenty-five of the seventy-two members have the distinct characteristic of owning the only remaining units in the park which are heated by oil, stored in above ground tanks. Defendant Garden Park Associates (GPA), is the owner and operator of mobile home parks in Hazlet and Holmdel, New Jersey. As the owner of a mobile home park, GPA leases space to those who own mobile home units.

In January 1992, GPA promulgated rules and regulations requiring all tenants of the park to convert their existing oil heating systems to natural gas by July 15, 1992. However, in a February 24, 1992 letter, the attorney for plaintiffs herein advised GPA that he represented:

the interests of the Garden Park Mobile Home Tenants Association, an association comprised of approximately seventy-two of the seventy-eight units in your Park.

\*    \*    \*    \*    \*    \*    \*    \*

In addition, I have been informed by the President of the Association, that you are prohibiting sales without a deposit of monies to insure that the heat will be converted. It is our additional position that this is a violation of *N.J.S.A.* 46:8C–3c, as an unreasonable restriction on the right of resale.

\*    \*    \*    \*    \*    \*    \*    \*

The Tenants Association stands ready to negotiate a fair and equitable lease and Rules and Regulations with you should you desire to enter into such negotiations.

The attorney for GPA, in a March 11, 1992 response indicating a desire to "maintain open communication with the tenants association," requested specification of the tenants' problems with the rules and regulations, "to see if we can come to some type of an agreement." Plaintiff's attorney's April 3, 1992 specifications of the tenants' objections to the rules and regulations included GPA's "requiring the tenants to convert from oil to gas heat (because) [a]side from the substantial expense that this would cause each of the tenants, I know of no law which permits the landlord to choose which form of heat his tenants may enjoy." As evidenced by plaintiffs' attorney's July 9, 1992 letter to GPA's attorney, a June 30, 1992 negotiation session failed to resolve this oil to gas conversion issue.

In November 1992, GPA changed the rules and regulations to require Garden Park tenants to remove existing oil tanks and convert to gas upon the sale of their units to prospective tenants (individuals who were purchasing units from existing owners). Plaintiff Thomas Longette, at one time, lived at 48 Garden Park Homes, in defendant's mobile home park. His unit has since been sold, but not before Longette was required to expend $1,200 to convert to gas and have his above ground oil storage tank removed as a condition of selling his mobile home. Plaintiffs, Home Owners and Longette, brought this action contending that defendant GPA wrongfully imposed conditions upon the resale of the mobile home units in contravention of *N.J.S.A.* 46:8C–3(c), seeking declaratory relief, an injunction and damages. Defendant GPA

now moves for summary judgment claiming that: (1) plaintiffs lack standing to bring this suit; and (2) the removal/conversion condition set by GPA is, as a matter of law, reasonable and within its statutory right.

## The Standing Issue

GPA contends that Home Owners' claims should be dismissed because it lacks standing to sue as an unincorporated association in that it fails to meet the requirements of *N.J.S.A.* 2A:64–1, which provides:

> Any unincorporated organization or association, consisting of 7 or more persons and having a recognized name, may sue or be sued in any court of this state by such name in any civil action affecting its common property, rights and liabilities ... as if the action were prosecuted by or against all the members thereof.

Specifically, GPA asserts that Home Owners is not an "association" as defined by *N.J.S.A.* 46:8C–1 to –21, (the Mobile Home Park Act), specifically, *N.J.S.A.* 46:8C–15, and furthermore, its name is not "recognized" so as to comply with *N.J.S.A.* 2A:64–1.

However, *N.J.S.A.* 46:8C–15 is not applicable to the within matter because the Mobile Home Park Act deals with the type of association necessary to give mobile home owners the right of first refusal to purchase a mobile home park when the owner of the park wishes to sell it. *N.J.S.A.* 46:8C–15.a. (emphasis added) begins:

> In order **to exercise the rights provided in sections 2 and 3 of this act** [Sections 46:8C–11 and 46:8C–12] the owners of mobile homes in a mobile home park shall form an association in compliance with this section and sections 7 and 8 of this Act [Sections 46:8C–16 and 46:8C–17].

*N.J.S.A.* 46:8C–11 (emphasis added) provides:

> a. If a mobile home park owner **offers a mobile home park for sale,** he shall notify the board of directors of the homeowner's association **created pursuant to this act** of his offer, stating the price and the terms and conditions of sale.
>
> b. The mobile home owners, by and through **an association duly formed in accordance with section 6 of this act** [Section 46:8C–15], **shall have the right to purchase the park,** provided two-thirds of the unit owners in the mobile home park have approved the purchase....

Since plaintiffs have not brought the within action in order to exercise a right of first refusal to purchase the park,

plaintiffs need not comply with Mobile Home Park Act in order to have proper standing to bring this action. Moreover, GPA's contention that plaintiff's association does not have a "recognized" name is without merit. GPA argues that plaintiff Home Owners is simply an informal branch of the "Hazlet Mobile Home Owners Association" (which is not a party to this action) and not a recognized entity in and of itself. However, the evidence presented by plaintiffs clearly refutes this assertion.

Peter Jadlowski, a twenty-year resident of Garden Park and President of plaintiff Home Owners, in his certification filed in opposition to defendant's motion for summary judgment, stated that over ninety percent of the Garden Park Hazlet units are members of plaintiff Home Owners, which unincorporated organization has been in existence for over fifteen years. Furthermore, Jadlowski certified that the association has regular meetings at which minutes are kept, holds formal elections every two years, and currently is led by a president, vice-president, and treasurer. Jadlowski also clarified how plaintiff Home Owners fits into the "Hazlet Mobile Home Owners Association" (HMHOA), which is an umbrella organization consisting of representatives of nine separate Mobile Home Owners Associations, representing each of the nine Mobile Home Parks in Hazlet, New Jersey. HMHOA was formed to deal with problems that are common to *all* mobile home parks in Hazlet, such as issues affecting the Hazlet Rent Leveling Ordinance. Each park has its own separate Mobile Home Owners Association which deals with *individual* problems in the separate parks. Jadlowski also happens to be the president of the umbrella organization, HMHOA, which may have caused some of the confusion in this action. Despite its affiliation with the umbrella group, it is clear that plaintiff Home Owners was established to act on its own when a problem arises that is peculiar to its park.

Lastly, it is clear that GPA was aware of the existence of plaintiff Home Owners and indeed "recognized" it as the representative of the residents. As early as February 24, 1992, more than two years prior to institution of the within action, plaintiffs'

attorney advised defendant that he represented the Home Owners and described the make-up of this association. In March, 1992, GPA's attorney's response recognized the association and indicated defendant's interest in maintaining open communication with the association. Subsequent to this correspondence, there was further correspondence and at least one face-to-face negotiation session between representatives of both sides. Based upon the foregoing, it is clear that defendant GPA dealt with plaintiff Home Owners as an unincorporated organization having a recognized name. Therefore, plaintiff Home Owners have standing to bring this action on behalf of its members.

## The Reasonableness Issue

■ Defendant GPA argues, in the alternative, that even if plaintiffs have standing, as a matter of law the removal/conversion requirement, placed upon residents who re-sell their units, is reasonable and within the park owner's statutory authority.

In November, 1992, the following requirement was placed upon the Garden Park residents:

[A]ll resale units *must* convert to gas heat *prior* to the transfer of title to the new owners. Management will not approve a tenant['s] buyer unless compliance is met.

GPA claimed this requirement served two purposes: 1) to protect the park land from toxic leaks, and 2) to spare the residents from costly clean-up fees should spills and leaks occur. Moreover, GPA contends that this condition upon the resale of a mobile home unit is justified by *N.J.S.A.* 46:8C–3, which provides:

a. ... The park may reserve the right to approve the purchaser of said mobile home as a tenant, but such permission may not be unreasonably withheld. ...

Defendant relies upon two expert reports to support its contention that the remaining above ground oil tanks are potentially hazardous, thereby warranting the removal/conversion requirement. However, a careful reading of these reports demonstrates that they do not support defendant's position.

The June 12, 1991 report of Thomas Andrews, P.E. concluded that there was "no record of environmental violations against the property to date," radon readings were low, and no potentially

hazardous sites were found within a one mile radius of the property. Andrews also examined all the above ground tanks and found no signs of staining or leaking; the only observation of decay was that rust was found on a number of tanks. Based upon these observations, and the fact that there were no legal prohibitions against these above ground storage tanks, Andrews suggested that each tank be placed on a concrete pad to prevent tipping and to identify easily any leaking in the future. However, removal of the tanks was not a requirement; it was only a secondary alternative. Indeed, Andrews recommended that, in order to lessen the possible release of oil onto the trailer park site, a tank's integrity be tested prior to transferring ownership of any mobile home. GPA's removal/conversion policy under consideration herein, however, does not require any such testing prior to removal.

The second defense expert report, the December 30, 1994, report of Environmental Waste Management Associates, Inc., likewise made no definite findings of hazardous conditions or risks to the park, but merely noted a "potential" for damage. There were no findings of already identifiable damage (i.e. leaks, spills or reported health problems); it simply contained a remark that there still existed some corrosion (rust) on several tanks. The second expert report made no argument or strong recommendation for removal of these tanks; the removal and conversion to gas at a cost of approximately $1200 per unit was only considered a "sound alternative".

Although New Jersey's Uniform Construction Code, *N.J.A.C.* 5:23–1 to –12.9, has no provisions specifically governing above ground tanks, it requires removal of unsafe structures if they "constitute a fire hazard or are otherwise dangerous to human life or the public welfare...." *N.J.A.C.* 5:23–2.32. Defendants' aforesaid expert reports fail to establish that plaintiffs' above ground oil tanks fall within the Uniform Construction Code's definition of an unsafe structure. Therefore, defendants' requirement that a resident/seller of a mobile home remove an existing, legal, non-leaking, non environmentally threatening, above ground

oil tank and convert to gas heat prior to re-sale is unreasonable, because no testing of the tanks' integrity is required, and because there is no evidence, other than speculative, of potential leaks.

■ A mobile park owner that leases space to mobile home owners cannot require its residents to spend over one thousand dollars per unit to make an improvement that will not benefit the seller, but rather, will confer a benefit upon the park owner. Section 217–33C of the Hazlet Rent Leveling Ordinance, provides:

> No landlord shall demand or receive, directly or indirectly, any premium or any thing of value, other than the rent fixed by this article, as a condition to the rental of any mobile home and/or mobile home space.

The required conversion, as a condition of approving the purchaser as a tenant in the park, is a "premium or other thing of value" prohibited by the provisions of this ordinance.

■ Even if this court were to find that the removal/conversion requirement was reasonable, defendants' reliance upon *N.J.S.A.* 46:8C–3 to support its resale condition is misplaced. This statute provides:

> The park may reserve the right to approve the purchaser of said mobile home as a tenant, but such permission shall not be unreasonably withheld. . . .

The statute gives a right to the park owner to approve the *purchaser* (not the *purchase* ) of the mobile home; it does not give the park owner the right to require *existing* tenants to make capital improvements on the property as a condition for approving the purchaser. Defendant's required tank removal and gas conversion condition does not take the potential purchaser into consideration. GPA's policy, if upheld, would permit a mobile home park owner automatically to withhold approval of *any* potential purchaser, whether or not the park owner even knew the identity of the potential purchaser, if the existing owner refused to remove the tank prior to re-sale.

A similar situation was considered by the court in *Metpark, Inc. v. Kensharper,* 206 *N.J.Super.* 151, 501 *A.*2d 1068 (Law Div.1985), where, in addressing the rights created by *N.J.S.A.* 46:8C–3.a., the court held that a mobile home park owner could not consider its

relationship with the present resident in deciding whether to approve a prospective purchaser as a tenant. Thus, if a park's relationship with a present resident bears, in any way, on its decision to withhold approval of a prospective purchaser as a tenant, such withholding of approval will be deemed unreasonable under the statute. *Metpark, supra,* 206 *N.J.Super.* at 158, 501 *A.*2d 1068.

In the present case, it is clear that GPA's policy has nothing to do with the worthiness of the prospective purchaser, but instead, relates only to the park owner's continuing attempt to require residents to convert from oil to gas without cost to the park owner. Since GPA's policy is rooted in the relationship between the park owner and the present residents, such withholding of approval of prospective purchasers by GPA is unreasonable. *Id.*

Defendant's reliance upon two unpublished, oral opinions is similarly misplaced, since both cases are clearly distinguishable. *MCS, Inc. v. Gross,* No. CAM–LT–08399–93, (Ch.Div. December 3, 1993), was a summary dispossess action for eviction that did not involve a claim under *N.J.S.A.* 46:8C–3, or the withholding of approval of a purchaser of a mobile home unit until the owner converted the unit from oil heat to gas heat. That case involved a review of a lease provision which required a particular mobile home owner to remove an old tank that was being used on the outside of the premises, even though the manufacturer of the tank had specifically indicated, on the tank itself, that it was only to be used inside. Consequently, the court found that the tank was environmentally unsound, since it was being misused by the owner. As the review of defendant's expert reports, *supra,* reveals, in the case at bar, there is no evidence that any of the above ground oil tanks are in any way environmentally unsound or designed only for interior use.

*Haslam v. Dolan,* No. ATL–SC–002705–90, (Law Div. December 14, 1990), a small claims case, did not involve a required conversion of a heating system from oil to gas, nor the removal of an above ground oil fuel tank; it involved replacement of an

existing underground oil tank with a newer oil tank. Obviously, environmental concerns are much greater with regard to underground oil tanks since their deterioration and maintenance cannot be seen, as is evidenced by the fact that New Jersey's Uniform Construction Code provides for the regulation of such tanks. *N.J.A.C.* 5:23–3.11B.

New Jersey's Supreme Court has recently set forth a revised standard for determining motions for summary judgment. In *Brill v. Guardian Life Ins. Co.,* 142 N.J. 520, 666 *A.*2d 146 (1995), the court stated that the motion judge must consider,

> ... whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

[*Id.* at 540, 666 *A.*2d 146.]

In the case at bar, when viewing the evidence in the light most favorable to the plaintiff, it is clear that a jury could find that the defendant's removal/conversion policy is unreasonable. Therefore, defendant's motion for summary judgment is denied.