720 A.2d 361

HANOVER MOBILE HOME OWNERS ASSOCIATION, AND JOSEPH AND EVELYN MADDEN, TOM ABROMOVITCH, GARY AND ROSE ARCHACAVAGE, CHARLES BAIR, DONNA BARBER, BELFORD BORDEN, GEORGE BOZSOLAK, DORIS BROWN, JASON AND NANCY CONK, CHRISTOPHER COOK, DAN AND MARGARET DAVIS, ROB AND JUDY DEBOW, KIM AND DAVID DIVINS, NERE AND RUTH DUBE, GAIL ERNST, SHARON ERNST, ROBERT AND SANDY FLOGEL, MARLIESE FREDLUND, HARRY GASTON, ALICE HAVENS, BEN HOPKINS, ROBERT AND SUE KELLY, KEVIN AND EDITH KOO, CAROLINE KRUPA, JOSEPH LARKEN, CAROL LOGGIE, ROY AND SHIRLY LOGGIE, BARBARA MANDEVILLE, MIKE MCGEE, JOAN MIKOSZ, TINA AND DAVID NEMETH, JEAN AND PAUL POPPE, DAVID AND MARGARET ROGERS, RUTH ROSSELL, ANN SCHENKER, PAUL AND FERN SCHUSTER, GEORGE SNYDER, JAMES STIEBRITZ, RICHARD SWEETSER, RICHARD SZWED, KARL AND LISA WASSAL, JOAN AND ART WORMULL, FRANCIS WRIGHT, SUSAN EVERT, JOSEPH HAVENS, PLAINTIFF–APPELLANTS, CROSS–RESPONDENTS, v. HANOVER VILLAGE ASSOCIATES, DEFENDANT–RESPONDENT, CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1998—Decided November 9, 1998.

Before Judges KING, NEWMAN and FALL.

*James A. Tarella,* argued the cause for appellants/cross respondents (*Tarella & Liftman,* attorneys; *Mr. Tarella,* of counsel and on the brief, *Beverly E. Liftman,* on the brief).

*Lori C. Greenberg,* argued the cause for respondent/ cross-appellant (*Lori C. Greenberg & Associates,* attorneys; *Ms. Greenberg,* on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

This appeal involves an action brought by plaintiffs, a minority group of tenants, who refused to comply with new lease provisions, against defendant, the landlord of the mobile home park where plaintiffs reside. Plaintiffs argued that two proposed lease provisions were unreasonable. The first provision required tenants to convert their heating systems from oil to natural gas, at his or her expense, and remove their thirty-year-old oil tanks. The tenants also objected to a second provision requiring them to anchor or tie-down their homes upon resale in compliance with State law.

After a non-jury trial, Judge Wells found that the lease provisions were reasonable conditioned upon defendant extending the time deadline for the oil to gas conversion for one year and defendant continuing to make the original $250 rent abatement available to tenants upon completion of the conversion within the specified time period. Plaintiffs appeal, arguing that the lease provisions are unreasonable and defendant cross-appeals, contending that the trial court erred in extending the time period by which plaintiffs can convert and by requiring defendant to provide the tenants who convert within the specified time a $250 rent rebate. We affirm both appeals.

I.

Hanover Mobile Village (the Park) located in North Hanover, New Jersey opened for business as a mobile park home in or about 1962. Park management sold mobile homes to people

seeking to reside in the Park and thereafter rented spaces to homeowners for placement of their mobile homes. In 1985, defendant, Hanover Village Associates, L.L.C. (defendant or landlord) purchased the ninety-nine lot mobile home park.

Each mobile home sits on dirt or a gravel bed. The homes sold or installed before 1985 were not tied down or anchored. Anchors or tie-downs are devices which are installed on manufactured homes "to limit the lateral and vertical movement of the home during heavy winds." The purpose of the tie-down is to prevent property damage during inclement weather. When the Park was developed, there was no natural gas service available. Consequently, Park owners installed kerosene or oil fuel heating systems in the homes before they were sold, and provided outdoor storage tanks for the kerosene or oil. At the time defendant purchased the Park, defendant was unable to obtain insurance coverage with respect to spillage of pollutants or contaminants such as kerosene, and at no point during its ownership was it able to secure such insurance coverage. The heating and fuel storage systems were included with the purchase of each home.

In 1995, when natural gas became available to the Park, defendant sought to upgrade the existing above-ground storage tanks on the premises. Subsequently, defendant distributed a memorandum to tenants, which required that existing oil tanks be replaced with "new Underwriters Laboratory approved outdoor tanks on a 4" thick concrete pad . . . ." Defendant also required a minimum of $100,000 insurance protection covering Hanover for any damage caused by a fuel spill. Alternatively, defendant proposed that homeowners convert to the use of natural gas and offered a $250 rent rebate and free oil tank removal to encourage the change.

Shortly thereafter, defendant learned that Public Service would agree to run gas mains and branches into the Park if approximately one-third of the Park's home owners agreed to use natural gas for heating. In May 1995, defendant forwarded new leases to plaintiffs requiring that each tenant execute the lease as a condi-

tion of continued occupancy. The two lease provisions at issue here required homeowners to: (1) convert from their existing heating fuel to either natural gas or electricity by July 31, 1997; and (2) tie-down their homes, if the homes were not already tied down, upon resale. Both requirements were to be met at the homeowner's expense. The homeowners who refused to execute the new lease were threatened with eviction and consequent value loss of their homes. A minority of tenants refused to execute the new lease and brought this legal action.

A. *Conversion of Existing Oil Tanks to Natural Gas.*

The lease provisions issued to the tenants in 1995 requiring them to convert their oil tanks to natural gas or electricity, provide as follows:

LEASE FOR HANOVER VILLAGE ASSOCIATES, L.L.C.

13. F. All Mobile Homes are required to convert to Natural Gas Heat and cooking or electric heat and cooking at the expense of the tenants by July 31, 1997.

## RULES AND REGULATIONS

9. b. All oil tanks and propane tanks used for heating and providing cooking to the mobile home must be removed on or before July 31, 1997 or on resale of the mobile home, whichever comes first. Tenants are required to convert to natural gas or electricity for heating and cooking and remove the tanks at their own expense.

Tenants who converted by the fall of 1995 were given a $250 rent abatement and their old tanks were removed by the landlord. A majority of the tenants converted during this time thereby taking advantage of the rent rebate. The cost of a complete conversion, including sales tax, permits, labor and materials, is between $1,200 and $1,500. The conversion, including all piping, permits and proper removal of existing tanks, could cost up to $2,144, however.

Both parties presented evidence concerning the condition of the existing tanks and the risks they currently pose. The parties were in agreement that the existing tanks are beyond their life expectancy. The life expectancy of an oil tank of the type involved

in this matter is between twenty to thirty years depending upon whether the tank is properly maintained. The average age of the oil tanks in the Park is between twenty and thirty years.

Douglas Harm of Brinkerhoff Environmental, a hydrologist, testified for defendant. He described two environmental risks associated with the existing oil tanks: oil leakage and well-water contamination. He testified that, based upon his inspection of the park, the oil tanks probably have been leaking or they have the potential to leak at any time. He stated that:

> the potential for a discharge from those tanks is great. They are really accidents waiting to happen. They're leaning, they're sitting on cinder blocks, heavily rusted, sitting on the ground. In my experience, I've seen tanks like that leak many times.

He also noted that the Park's tanks (which are UL–80's) are usually placed indoors, in basements, not outdoors where the current tanks are located. In his opinion, if natural gas was available, the tenants should change to natural gas.

Harm also testified with respect to the risk of polluting drinking water at the premises, which was serviced by the only two wells located in the Park. On cross-examination, he indicated that a spill of an entire 275 gallon tank would be required in order to impact the existing wells at the premises or compromise the drinking water. Harm further noted that only a long-term leakage of fuel oil could affect the drinking water. Harm, however, expressed no opinion as to the likelihood that environmental damage or leakage would occur. There was one reported incident of fuel spillage in the Park's thirty-five-year history, which was a small valve leak.

Richard Doppler, the general manager of Belasco Petroleum Company, testified for plaintiffs. Belasco Petroleum provides fuel oil delivery, burner, and air conditioning services to residents in the Park. Doppler was admitted as an expert in oil tank installation and servicing.

Doppler testified concerning his observations of tank conditions at the Park. He found that many of the tanks were failing and required attention. According to Doppler, the problems with

these tanks included excessive corrosion on the outside of the tanks, discoloration, and the support bases were not sturdy. The tanks with excessive corrosion or discoloration needed to be painted if not replaced. The improper support structure could be corrected by pumping oil in and out of the tank, putting concrete pads under it, and proper legs on the tank. This could be done by Belasco Petroleum for approximately $150. Doppler also found that some of the tanks had leaky valves. Doppler admitted that his company does not check the fittings on the oil tanks to see if they are leaking. Further, there is no way to monitor if oil is leaking from the tank's connection under the tenant's home, which can occur at any time.

John Solly, a park management expert and president of the New Jersey Manufactured Housing Association (NJMHA), testified and submitted a report as to the reasonableness of the lease provisions. He urged that something be done immediately to effect an oil to gas conversion. In his opinion, the lease provisions concerning the requirements for natural gas conversion were reasonable and in conformity with hundreds of other leases that he had reviewed for other parks.

### B. *Tie–Down Requirements*

The new lease provisions provide that all homes must have tie-downs and be properly anchored at the time of resale. The lease further provides that the tie-downs are the tenants' responsibility.

Tie-downs are required by law at the time a mobile home is installed in order for a certificate of occupancy to be issued. However, numerous homes, including all of the homes installed before 1985 in the Park, have been installed without tie-downs. Consequently, in 1991, the Department of Community Affairs (DCA) adopted a self-regulating program with the cooperation of the NJMHA requiring Park management to adopt within their resale standards a requirement of anchoring at the time of resale. In the absence of a contrary contractual agreement between the homeowner and Park management, anchoring is to occur at the

time of resale and is the homeowner's responsibility. The average cost of a tie-down is $350.

William Connolly, the Director of the Division of Codes and Standards for the DCA, testified that tie-downs were required under State law and there was an agreement that tie-downs be installed upon resale. Connolly was of the view that the landlord had the right to contractually require the tenants to tie down their homes.

While trial testimony and reports reveal that tie-downs are required under State law, the issue of who should bear the cost of the tie-down was disputed. In Connolly's opinion, the tie-down is required at the time the home is installed. According to Connolly, the responsibility for assuring that the home is tied down is that of the property owner, not the tenant. Solly, however, testified that in the absence of a contractual agreement between the home-owners and Park management, the cost of anchoring is the homeowner's responsibility.

## II.

By letter opinion dated June 2, 1997, Judge Wells held that the defendant's proposed requirement of oil to gas conversion and the tie-down resale standard were reasonable. The court further concluded that the tie-down requirement is not prohibited as a matter of law. In finding the oil to gas conversion reasonable, the court reasoned that both parties benefit from an oil to gas conversion. The court concluded that defendant Park benefits by "the elimination of the random and virtually unpreventable long term risk of environmental damage to its property by the acciden-tal spills of kerosene fuel oil from ... [the] dilapidated outdoor tanks, each of which holds up to 275 gallons of the fuel." The court also found the following benefits to plaintiffs, the mobile home owners:

> The mobile home owners benefit from the short term nuisance and costs attendant to loss of heating capacity, the delay and expense incident to clean up that such a spill would cause and the elimination of the risk of potential contamina-

tion that might result to the park's nearby well-water drinking supply. In addition, the home owners benefit from relief from contingent liability to third parties, including the landlord, for the costs such a spill might entail for which no insurance is available.

The trial court further reasoned that the conversion requirement is reasonable due to the real and substantial risks posed by the existing oil tanks. Judge Wells stated that:

The tanks, generally, are in bad shape. Practically, they cannot be inspected to detect interior deterioration. The soil beneath the park is sandy and the water wells are close by the homes and clearly within harms way should a spill or slow leak go undetected for a period of time. The estimated costs of conversion which would vary to a high of $1,600, depending on whether the home requires a new heater, but which on average would be significantly lower, are, in my opinion, reasonable.

Furthermore, the court observed that a majority of the home owners have already converted.

In finding the tie-down requirement reasonable, the court determined that the benefit of the tie-down inures almost entirely to the tenant. The court, citing to the DCA requirement that mobile home owners anchor their homes, construed the tie-down mandate as an effort to facilitate enforcement of a requirement of public safety. The court further noted that the DCA permitted the park owner to delegate the cost of anchoring to the home owners and permitted tie-downs or anchoring to be done at resale.

The court conditioned its conclusion upon the following two requirements: (1) that defendant extend the deadline for the oil to gas conversion for one additional year from July 1, 1997; and (2) that defendant continue to make available to tenants the rent abatement not to exceed the $250 that it originally made available upon the completion of the conversion.

### III.

On appeal, plaintiffs first contend that the trial court's decision on the merits improperly shifted the burden of proving the reasonableness of the proposed lease changes from the defendant landlord to the plaintiffs. According to plaintiffs, the trial court approached the issue from a finding that the conversion require-

ment of the lease was presumptively reasonable, and imposed on plaintiffs the burden of proving otherwise. We disagree.

In his decision dismissing the parties' cross motions for summary judgment, Judge Wells properly placed the burden of proving the reasonableness of the lease provisions on the defendant landlord. A landlord has the burden of proof with regard to the reasonableness of lease changes. *Village Bridge Apartments v. Mammucari*, 239 *N.J.Super.* 235, 239, 570 *A.2d* 1301 (App.Div. 1990). Further, *N.J.S.A.* 2A:18–61.1.i provides that where a tenant has received notice of termination the landlord or owner has the burden of proving that any change in the terms and conditions of the lease is both reasonable and does not substantially reduce the rights and privileges to which the tenant was entitled prior to the change. A careful review of the record discloses that the burden of proof was properly placed on defendant, and defendant met its burden of proving the reasonableness of the conversion requirement.

Plaintiffs next argue that defendant's fuel conversion requirement is unreasonable as a matter of law. The trial court concluded that the conversion requirement was reasonable. In doing so, the court noted the dual benefits of conversion and the substantial environmental risks posed by the existing tanks.

An appellate court is bound by the trial judge's determination of credibility and those findings of fact which are reasonably supported by the record. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). Where the focus of dispute is not on credibility but, instead, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the appellate function is somewhat broadened. If an appellate court's review of the record "leaves [it] with the definite conviction that the judge went so wide of the mark that a mistake must have been made," an appellate court may "appraise the record as if [it] were deciding the matter at inception and make [its] own findings and conclusions." *Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 *N.J.Super.* 332,

338, 382 *A*.2d 933 (App.Div.), *aff'd,* 78 *N.J.* 320, 394 *A*.2d 360 (1978). The trial judge's conclusion that the conversion requirement is reasonable is amply supported by the trial testimony.

Plaintiffs rely on *Garden Park Mobile Home Owners Association v. Garden Park Associates,* 292 *N.J.Super.* 442, 678 *A*.2d 1191 (Law Div.1996), *aff'd,* 305 *N.J.Super.* 52, 701 *A*.2d 942 (App.Div. 1997), in support of their argument that the fuel conversion requirement at issue here is unreasonable. *Garden Park* does not stand for the proposition that a blanket change in a lease provision is per se unreasonable. *Garden Park* involved a lease provision requiring tenants to convert their existing oil tanks to natural gas upon the resale of their homes. In finding the oil conversion requirement unreasonable, the *Garden Park* court concluded that:

the [expert] reports made no definitive findings of hazardous conditions in connection with the tanks, and only suggested that the removal of the tanks and conversion to gas was merely a "sound alternative."

[305 *N.J.Super.* at 55, 701 *A*.2d 942].

The court further stated that the expert reports made no definite findings of hazardous conditions or risks to the park, but merely noted a "potential" for damage. 292 *N.J.Super.* at 449, 678 *A*.2d 1191. In addition, there were no findings of already identifiable damage, such as leaks, spills or reported health problems. The report made no argument or strong recommendation for the removal of these tanks. *Ibid.* Thus, the court concluded that the conversion requirement was unreasonable as a matter of law.

The proofs adduced in the *Garden Park* case fell far short of the proofs presented here. Defendant presented ample evidence of the risks associated with the existing oil tanks. First, the existing oil tanks are beyond their life expectancy. Having a life expectancy of twenty to thirty years, a majority of these tanks are over twenty years old.

Second, testimony from both parties indicate that most of the tanks are discolored, rusted, and supported by improper structures. Further, the overall poor condition of the tanks indicates a potential for oil leakage. There was one proven leak and admitted

probable leaks, in addition to the current leaks· that cannot be detected. An oil leak posed a serious threat of contamination to the only water supply to mobile home residents. Finally, the fact that a majority of tenants have converted, although alone not controlling, supports the conclusion that the existing tanks may be hazardous.

Plaintiffs argue that there are reasonable, less costly, alternatives to requiring conversion in order to deal with the potential for leakage, such as tank replacement. While some of the tanks may be in a better condition than others, the overall conditions of the tanks is generally poor and beyond their life expectancy. Complete conversion, rather than tank replacement is the optimal solution. It was not unreasonable for the trial court to so conclude.

## IV.

Plaintiffs next contend that the trial court failed to address the reasonableness of the *tie-down requirement*. Plaintiffs first argue that the trial court erred in concluding that the tie-down requirement was reasonable simply because it would result in a safety benefit to the homeowners.

We disagree. In concluding that the tie-down requirement was reasonable, Judge Wells stated:

[T]he benefit [of tie-downs] inures almost entirely to the tenant. While the DCA has imposed the requirement of anchoring on mobile home park owners, generally, the Court construes that as an effort to facilitate enforcement of a clear mandate or public safety. Indeed, the DCA left to park owners the decision whether to delegate the cost of anchoring to individual home owners. Nor do I read *N.J.S.A.* 46:8C-3 as forbidding, at the time of resale, the reasonable imposition of safety or aesthetic conditions relating to the physical condition of the mobile home itself. In that respect, the Court notes that skirting has been such a condition of resale for years. I also conclude that the estimated cost of anchoring, which can be accomplished to any surface, is modest given the resultant safety increase.

Pursuant to *N.J.S.A.* 46:8C-2(a), a landlord/owner of a mobile park is permitted to require tenants to anchor or tie-down their homes. The landlord, however, may not direct from whom the tenants are to purchase the tie-downs. In 1991, the NJMHA

required that mobile park management adopt resale standards mandating that a home be anchored before a transfer of owner-ship or change of occupants. In compliance with the NJMHA regulation, defendant incorporated such provision into the leases in 1991. The provision in the 1995 lease contains the same requirement.

Additionally, citing to *Garden Park, supra,* plaintiffs contend the proof of the cost-effectiveness of a conversion policy is not evidence that the policy itself is reasonable. While plaintiffs properly cite the proposition that the cost-effectiveness of a con-version policy, alone, is not evidence that the policy is reasonable, plaintiffs application of this proposition to the tie-down require-ment here is misplaced. Judge Wells' finding that the tie-down requirement is reasonable was not based upon a cost-effective analysis. Instead, Judge Wells based his decision upon State law and the safety benefits to the tenants in the securing of their homes.

■ Plaintiffs further argue that the trial court incorrectly interpreted *N.J.S.A.* 46:8C–3, which, according to plaintiffs, specif-ically prohibits the imposition of costs on a mobile homeowner at the time of resale as an unreasonable restriction.

*N.J.S.A.* 46:8C–3(a) provides:

No mobile home park shall deny any resident of such mobile home park the right to sell said resident's mobile home within the park or require the resident to remove the mobile home from the park solely on the basis of the sale thereof. The park may reserve the right to approve the purchaser of said mobile home as a tenant, but such permission may not be unreasonably withheld . . . .

Because *N.J.S.A.* 46:8C–3 does not forbid at the time of resale, the reasonable imposition of safety or aesthetic conditions relating to the physical condition of the mobile home itself, the trial court's conclusion that such a requirement conforms with the law is correct.

■ Plaintiffs also contend the trial court failed to consider the fact that tie-downs are required to obtain a Certificate of Occupan-cy, and as such, the cost of installation should have been included

in the initial sale price of the homes. The cost of the tie-downs was properly placed on plaintiff homeowners. Plaintiffs receive a safety benefit by anchoring their homes. Further, the tie-downs are to be installed upon the resale of a home. Plaintiffs can offset the expense of the tie-down by negotiating the cost in the sale price of their home upon resale.

## V.

Defendant cross-appeals, first arguing that the trial court exceeded its authority in requiring the landlord to provide the plaintiffs who convert a $250 rent rebate. Defendant contends that the rent rebate offered to the tenants who converted by September 30, 1995 was not a provision of the lease. Thus, the tenants who brought this action and did not convert by the time specified should not be entitled to a rebate. We reject defendant's argument.

■ Plaintiffs had a statutory right to contest the reasonableness of the lease provisions. *N.J.S.A.* 46:8–48. Furthermore, the trial court determined that the conversion requirement was reasonable only when coupled with the rent rebate and an extended time period in which plaintiffs may convert. The trial court did not exceed its authority in requiring the landlord to offer plaintiffs who convert within an extended time period a rent abatement.

## VI.

Defendant next argues that, because the trial judge found the new lease provisions reasonable, he should have granted judgment of possession and evicted the tenants who refused to sign the lease.

■ Under *N.J.S.A.* 2A:18–61.1(i), a landlord may evict a tenant for a tenant's refusal to accept "reasonable changes of substance in the terms and conditions of the lease." Again, however, plaintiffs had a legal right pursuant to statute to contest the reasonableness of the lease terms. Therefore, the trial court

could not have granted a judgment of possession to the landlord because of the tenants' failure to sign the lease.

On both the direct and cross-appeals, we affirm.